### UNITED STATES v. APPALACHIAN ELECTRIC POWER CO.
### No. 8.

District Court, W. D. Virginia, at Roanoke.
April 22, 1938.

M. Goetz, of Washington, D. C., for plaintiff.

Newton D. Baker and Raymond T. Jackson, both of Cleveland, Ohio, M. F. Millikan, A. Henry Mosle, Creswell M. Micou, Fraser M. Horn, and Wendell W. Forbes, all of New York City, John S. Draper, of Pulaski, Va., and John L. Abbot, of Lynchburg, Va., for defendant.

Abram P. Staples, Atty. Gen., for the State of Virginia.

Homer A. Holt, Atty. Gen., for the State of West Virginia.

PAUL, District Judge.

The cause of action set out in the bill of complaint, stated briefly and in substance, is as follows: That the defendant, a Virginia corporation engaged in the business of producing, distributing, and selling electric power, has begun and is continuing the construction of a dam across the New river near Radford in Pulaski county, Va., for the purpose of impounding the waters of that river and utilizing the same for generating electric power; that the New river is a stream which arises in the northwestern part of the State of North Carolina and flows in a general northerly and northwesterly direction across the State of Virginia, into the State of West Virginia, in which latter state, after joining with the Gauley river, it becomes known as the Kanawha river and, under the latter name, continues to flow in a general northwesterly direction until it discharges into the Ohio river at Point Pleasant, W. Va. It is alleged that the New river and the Kanawha constitute one continuous stream and that it is a navigable interstate stream constituting a navigable waterway of the United States, and that the New river, at the point where defendant's dam is being constructed, is a navigable water of the United States and said dam is being constructed in and across a navigable water of the United States. It is alleged that the plaintiff has recently expended, and is continuing to expend, large sums in improving the conditions and facilities of navigation in that portion of the stream known as the Kanawha river; that defendant's project at Radford would, by impounding the waters of New river, not only render New river impossible of navigation during long periods of each year, but would seriously impair navigation upon the Kanawha river.

Harry W. Blair, Asst. Atty. Gen., Huston Thompson, John W. Aiken, Wayne C. Williams, and Allan D. Jones, Sp. Assts. to Atty. Gen., John A. Skiles, of Washington, D. C., and L. A. Gellis, Sp. Attys., Oswald Ryan, Gen. Counsel, Federal Power Commission, and Willard W. Gatchell, Atty., Federal Power Commission, both of Washington, D. C., Joseph H. Chitwood, U. S. Dist. Atty., of Roanoke, Va., and Charles

It is alleged that the defendant, before proceeding with the construction of its Rad-

ford project, applied to and obtained from the State of Virginia a license to construct the same, and that defendant is proceeding under the purported authority of said license. But that the acts of defendant are being performed without the consent of Congress and without any permission or authority of the Secretary of War and without having obtained any license from the Federal Power Commission and that such acts are in violation of the laws of the United States, and particularly in violation of what is known as the Rivers and Harbors Act of March 3, 1899, §§ 9, 10, 33 U.S.C. §§ 401, 403, 33 U.S.C.A. §§ 401, 403, and of the Federal Water Power Act of June 10, 1920, as amended, 16 U.S.C. §§ 791–823, 16 U.S.C.A. §§ 791–823.

It is further alleged that in June, 1926, there was filed before the Federal Power Commission by the New River Development Company, a predecessor in interest of defendant, a declaration of intention to construct the dam at Radford and that in September, 1926, the New River Development Company transferred its rights in such declaration of intention to the defendant, which thereafter continued the presentation of the same to the Federal Power Commission; that the Commission, after causing an investigation to be made and considering the plans of defendant's project, made a finding that said project would affect the interests of interstate commerce; that, notwithstanding said finding, the defendant, without obtaining a license from said Federal Power Commission, began its construction of said dam, on or about June 1, 1934, and is proceeding with the same.

Based upon its allegations that the stream in which the dam is being constructed is a navigable water of the United States and that the construction of the dam will obstruct and impair interstate commerce on the New river and on the Kanawha river and will affect the interests of interstate commerce, the bill prays: (a) That the defendant be enjoined from constructing or maintaining its project otherwise than under a license to be issued by the Federal Power Commission; or in the alternative (b) that the court issue a mandatory order requiring the defendant to remove any and all parts of the project from the limits of New river.

In addition to the essential facts above recited, the bill contains much matter in recital of evidential facts upon which it bases the contention that the New river is naviga-

ble and that the construction of this dam will impede navigation on it and on the Kanawha. This matter need not be recited here. So far as it is proven by evidence and is material, references will be made to it in the later discussion.

### The Answer.

The answer, briefly summarized, avers in substance the following matter in defense to the bill of complaint: The defendant admits that it has begun and is continuing the construction of the project at Radford. But denies that such construction is in any way unlawful. It denies that New river is a navigable stream over which the United States has jurisdiction and control but, on the contrary, avers that it is a nonnavigable stream and, at the point of the proposed project, is subject only to the jurisdiction and control of the State of Virginia. It avers that the defendant now owns the lands which will be affected by the construction of the dam and that the project does not require or involve the use of any lands or other property of the United States; and that, being the owner of all lands affected, the defendant has a full and complete proprietary right to construct its water power project, subject only to such regulations as the State of Virginia may impose; that permission to construct said dam has been granted by the State of Virginia, in pursuance to application therefor, and that said project is being constructed pursuant to a license granted by the State of Virginia and in conformity to the conditions and restrictions imposed by said state.

Defendant admits that the Kanawha river, lying wholly within the State of West Virginia and into which New river flows, is a navigable stream and that the plaintiff has developed the Kanawha for the improvement of navigation thereon. But it avers that the head of navigation, even with this development, is at a point in the Kanawha downstream from the point of inflow of the New river; that the New river is not and never has been navigable, and that the project of defendant is located on the New river approximately 155 miles upstream from the head of navigation on the Kanawha. Defendant avers that neither the construction nor operation of its project will interfere with or obstruct navigation or the navigable capacity of any navigable water of the United States; that the defendant intends and has declared its intention to so operate its project as not to interfere with or obstruct such navigation or navigable capacity and

that, even if this were not true, it would be impossible for said project, in the course of any known or practicable method of operation, to interfere with or obstruct or in any way adversely affect navigation or the navigable capacity of any navigable waters of the United States; that the laws of Virginia under which the license from that state was issued protect any rights of the United States; and that in any event the Secretary of War has power summarily to remove any obstruction if any such occur.

The answer further states that it is true that New River Development Company, predecessor in interest of defendant, filed a declaration of intention with the Federal Power Commission in respect to the Radford project, but says the date of such filing was on or about June 26, 1925, and not June 26, 1926, as alleged in the bill. And admits that all rights and obligations under said declaration of intention were transferred to defendant on September 2, 1926, and that defendant continued presentation of the same before the Commission. It states this declaration of intention was presented for the purpose of obtaining a finding that neither the construction nor operation of defendant's project would affect the interests of interstate commerce. It avers that on June 1, 1927, the Federal Power Commission made a finding that the portion of the New river involved by defendant's project is not "navigable waters" within the meaning of the Federal Water Power Act, which finding was correct. But, it avers, the Commission also made a finding that the proposed construction would affect the interests of interstate commerce, which latter finding, the defendant avers, is erroneous and arbitrary, is unsupported by evidence and contrary to the evidence and facts before the Commission; that the defendant, although challenging the existence of any jurisdiction in the Federal Power Commission over the project, nevertheless offered to accept a federal license containing such conditions relating to the manner of construction and operating such project as are necessary and appropriate to prevent interference with the navigable capacity of the Kanawha river; but that the Commission refused to issue such a license and insisted that defendant should accept a license containing the conditions provided by the Water Power Act for projects located on navigable waters, contrary to the finding of the Commission that the project was upon a nonnavigable stream; that the license tendered by the Commission, known as the standard form license, contained many conditions which have no substantial or reasonable relation to the interests of interstate commerce or to the protection of the navigable capacity of any navigable waters of the United States; that these conditions are beyond the power of the Federal Power Commission or the federal government to impose as a condition to defendant's right to build and operate its project; that the tendered license contains unauthorized and unconstitutional conditions and requirements which have no relation to the protection of navigation or navigable capacity and which would restrict defendant's use of its property and depreciate the value thereof, and that defendant refused to accept the tendered license; that, even if it be held that defendant's project is located upon a navigable stream or is so located as to affect the navigable capacity of a navigable water and that a license from the Federal Power Commission is required therefor, the conditions of such license must be limited to those having a reasonable relation to the protection of navigation or navigable capacity and cannot include conditions having no relation to such matters.

The defendant avers that the Federal Power Commission and the Chief of Engineers of the United States Army, as agencies of the plaintiff, have made findings that New river is not a navigable stream and that plaintiff is thereby estopped to question its nonnavigability. And finally the defendant avers that no valid cause of action is stated by the bill because it shows no present damage to or invasion of plaintiff's rights but only an assumed and hypothetical invasion; that the alleged effect of the construction and operation of the project upon interstate commerce is merely a speculative, hypothetical and conjectural effect which could be produced only if defendant, at some future time, were to operate its project in a fanciful and impracticable manner, and that there is no showing of any intention on the part of defendant to operate in such manner; that the assumed possibility of producing an effect on interstate commerce by operation of the project is predicated solely upon conjecture that it is physically possible for defendant so to operate it, although it has never done so, has never proposed to do so, and has expressly asserted that it intends not to do so.

Upon the filing of the answer the plaintiff submitted a motion to strike it upon the

usual ground of insufficiency. Argument upon this motion was at length and covered substantially every issue of law involved in the case. The court, being of opinion that an accurate and proper application of the pertinent legal principles could be arrived at only after full development of all facts, denied the motion to strike the answer. Upon argument of this motion the State of Virginia and the State of West Virginia, appearing by their respective Attorneys General, who alleged that these states had a material interest in the litigation, were granted leave to appear amici curiæ and filed briefs.

Upon the trial of the case, the testimony of witnesses and the exhibits introduced produced a record voluminous beyond description. For this the court is, no doubt, in some measure responsible. In an effort to ascertain all pertinent information bearing on the issues involved, much latitude in the introduction of evidence was allowed. And industrious counsel armed with every facility for research, historical and scientific, responded to the opportunity offered. The result is a record of evidence so extensive that no effort to recount it or even to summarize it is possible. Such references as are made to the evidence must necessarily refer to it in the most general way and to facts established by the weight of it.

### The Streams Involved.

It appears necessary to a proper consideration of the issues involved in this case that there should first be determined whether New river is a navigable stream. To this end a description of the course of the New and Kanawha rivers, their physical characteristics and other facts pertinent to the questions involved, is desirable.

The New river has its sources in two mountain streams in the northwestern part of the State of North Carolina, known as the north and the south forks of the river. These, uniting to form the New river at a point near the North Carolina-Virginia state line, flow into Grayson county, Va. A mile or so after entering Virginia, they are joined by Wilson creek. Most of the maps, profiles, etc., introduced in evidence show the course of the river to the vicinity of Wilson creek and that point may be said to be taken as the head of the river for the purposes of this case. References to distances, etc., hereafter made will treat the mouth of Wilson creek as the head of New river. Beginning at the mouth of Wilson creek, the flow of the river is practically due east for about 25 miles. It then turns in a generally northeasterly direction for approximately 100 miles, during which it passes through portions of the counties of Grayson, Carroll, Wythe, and Pulaski. Below Radford, in Pulaski county, the river turns generally northwestward through Giles county and crosses the Virginia-West Virginia state line at a point about 160 miles below its head (the mouth of Wilson creek). After crossing into West Virginia, it flows north for about 25 or 30 miles to the city of Hinton and thence inclines to the northwest and flows about 65 miles in that general direction to Gauley in Fayette county, W. Va., where it forms a junction with the Gauley river, which comes in from the east. Below this point the stream resulting from the junction of the New and the Gauley is known as the Kanawha river, which continues in a northwestward direction about 95 miles to junction with the Ohio river at Point Pleasant, W. Va. Immediately below the junction of the New and the Gauley (1 or 1½ miles below) is the point known as Kanawha Falls, which will hereafter be frequently referred to. Kanawha Falls is a precipitous rapid with a fall of 16 feet. This point may be said to be the head of the Kanawha river, and the planned head of navigation on the Kanawha is just below Kanawha Falls. For convenience, the stream below the junction of the New and the Gauley will be referred to as the Kanawha river; the designation New river will apply to the stream commonly known by that name and extending from the mouth of Wilson creek to the junction with the Gauley river. The distance from the mouth of the Kanawha up to the mouth of Wilson creek is approximately 347 miles; and from the mouth of New river (at Gauley) up to the mouth of Wilson creek is about 252 miles. These distances are measured in the course of the stream which, particularly in New river, is marked by many large bends or loops.

The elevation above sea level at the mouth of Wilson creek is about 2,440 feet; at the mouth of New river (at Gauley) 651 feet; at the mouth of the Kanawha about 500 feet. The elevation at Kanawha Falls, head of navigation on the Kanawha, is 620 feet. It will thus be seen that the fall in the Kanawha from Kanawha Falls to the Ohio river is 120 feet in a distance

of 96 miles, or 1.25 feet per mile; while the fall in New river from the mouth of Wilson creek to Gauley is 1,789· feet in a distance of 252 miles, or 7.1 feet per mile. The slope in New river, however, is not uniform throughout its length. For example, from Wilson creek downstream for about 40 miles the fall is fairly uniform at a rate of about 5.7 feet per mile, while in the next succeeding 18 miles there is a fall of 260 feet, an average of 14.4 feet per mile. Nor are the steeper slopes of the river confined to its upper reaches, for we find that in that portion of the river between its mouth and the gauging station at Caperton, W. Va., 17 miles above, there is a fall of 289 feet, or 17 feet per mile. These variances in slope occur throughout the course of the stream. The project of defendant which is the subject of dispute is located at a point about 5 or 6 miles upstream from the town of Radford, Va., and is approximately 100 miles below the mouth of Wilson creek and about 152 miles above the mouth of New river. It is at an elevation of about 1,730 feet above sea level. In this portion of the river, and for some miles above and below, the slope of the river is fairly uniform at from 5 to 8 feet per mile.

The variations in the slope occur at short intervals and the river, throughout its entire length, consists of a series of pools of comparatively still water separated by shoals or rapids. The pools vary in length from a few hundred yards to as much as several miles, with a probable average length of less than a mile. The rapids also vary in extent and also in the degree of fall. Rapids of 2,000 feet are not uncommon and some are of much longer extent. In some of them the water falls almost vertically for from 3 to 6 feet. The slope of the river is such as tends to a rapid runoff of the water and to high velocities in the current of the· stream, particularly through the shoals or rapids. Throughout its length the bed of the stream is rocky, being across ledges of limestone and sandstone and, at many places, with boulders and jutting rocks above the surface of the water. In the course of a report made by the Secretary of War to the House of Representatives in 1935 (74th Congress, House Document No. 91) there is contained the following general description of New river which is here quoted because of its brief but accurate description of the general characteristics of the stream:

"Throughout almost its entire length the river flows through a rugged mountainous country. Its valley is narrow, the flood plain being very little wider than the low-water channel, which varies in width from about 200 to 1,000 feet. In many places the banks are sheer bluffs rising from the river's edge. Ledges of limestone, sandstone and shale crossing the river at frequent intervals create rapids and waterfalls. The waterfalls vary in height up to about 18 feet. Between the ledges there are usually short pools of varying depths. The low-water depth in the channel varies from a few inches to more than six feet."

In its course the New river has a number of tributary streams. The principal ones of these are Reed creek, Reed Island creek, and Mack creek, which enter above the site of defendant's project, and Little river, Walker creek, Indian creek, and Bluestone river, which enter between the site of defendant's project and the city of Hinton, W. Va. At Hinton the New river receives Greenbrier river, its largest tributary. Between Hinton and the mouth of New river there are few, if any, tributaries of any moment. One peculiarity of the river is that the section from Hinton to the mouth of the river is more steep, rough, and rugged than any other section. A few miles below Hinton the river enters what is known as the gorge through which it flows for approximately 45 miles in a narrow and tortuous channel between high mountains. The bed is a mass of sharp ledges and boulders and through this, with the steepest slope in its entire course, the water rushes with great velocity.

The drainage area of the entire New River is 6,918 square miles. The drainage area at the site of defendant's project is 2,400 square miles. Due to seasonal variations in precipitation and the slope of the stream, there is a wide fluctuation in the volume of flow. At the site of the defendant's project, the average flow over a period of 28 years ending September 30, 1935, was 3,211 cubic feet per second, but the flow is less than this for 65 per cent. of the time. The lowest flow known at this point was 521 second feet on September 6, 1930. The greatest flows known at this point occurred during floods in 1878 and 1916 and were estimated to be about 155,000 second feet and 146,000 second feet respectively. At the mouth of New river, the average flow over a period of years is stated to be 10,100 cubic feet

per second, and the average flow of the Gauley river at its mouth 2,600 feet per second. At Kanawha Falls, which, as stated, is the head of the Kanawha, and immediately below the junction of the New and the Gauley, the records for 56 years show an average flow of 13,000 second feet, a maximum of about 270,000 second feet on September 14, 1878, and a minimum of 640 second feet on August 15, 1930. The drainage area at Kanawha Falls is 8,300 square miles.

From these figures it will appear that, while the flow in New river is subject to wide variation, the river carries a large volume of water in the course of a year. There is no denial that the volume of water passing through the stream over any extended period would be sufficient for purposes of substantial navigation provided other conditions obtained which made it available for that purpose.

The Kanawha river, extending about 95 miles from Kanawha Falls to Point Pleasant, carries the waters delivered by the New and the Gauley rivers as well as that of tributary streams entering below Kanawha Falls. While there is some variation in the slope of the Kanawha, it is fairly uniform and comparatively small, averaging about 1.25 feet per mile throughout its course. It is conceded that the Kanawha is at present a navigable stream, and that the federal government has developed, and is developing, its navigable capacity by a series of dams and locks which will permit of substantial navigation to a point shortly below Kanawha Falls.

### Question of the Navigability of New River.

In regard to the navigability of New river, the following, each briefly and generally stated, are the contentions upon which the plaintiff appears mainly to rely:

(1) That the names Kanawha and New are names given to different portions of the same stream and that they comprise one stream which must be treated and dealt with as a whole. That its actual and conceded use for purposes of navigation (in the lower reaches) imparts to the stream as a whole the status of a navigable water over which the federal government has control.

(2) That the States of Virginia and West Virginia, have dealt with and treated the New river as a navigable stream. That

the federal government has done likewise and has, in the past, appropriated and expended funds for the improvement of the navigable capacity of the river.

(3) That New river has in fact, in past years, been used for the movement of commerce in substantial amounts between the States of Virginia and West Virginia and that it is now available for and susceptible to such use.

(4) That, aside from the question of actual present use in interstate commerce, the New river is susceptible of development for the purpose of commercial navigation.

### Lack of Navigability Below Hinton.

The matter set out in (1) above needs only brief discussion. The Kanawha and the New rivers are one stream only in the sense and to the extent that this is true as to any stream and its largest tributary; but the fact that any river may in any portion of its course be navigable and subject to such control as the United States may have over navigable waters does not invest every tributary of such river with the same status. To hold otherwise would be to extend the status of a navigable water, with all the consequences thereof, to the remote sources of the tributary streams, the mountain brooks, and spring branches which are the ultimate sources of so many of our great rivers. In the instant case, it happens that a sharp difference in the physical characteristics of the Kanawha and the New rivers serves to emphasize the fault in plaintiff's contention. The Kanawha is a comparatively placid stream, fairly deep, and with a slope of only 1.25 feet per mile. The limit of these characteristics is distinctly marked by Kanawha Falls. Above that point is the New river, running over a bed of rocks and ledges, a stream of irregular but steep descent and of high velocity. The lack of identity for purposes of navigation is further emphasized by the fact that the lower portion of the New river (for about 50 miles above Kanawha Falls) is the most turbulent and precipitous of the entire river and forms a barrier between the navigable Kanawha and any possibly navigable waters of the New.

It is this stretch from the mouth of the New river up to near Hinton which was described as "an impetuous and almost resistless torrent" in the course of a report to the Secretary of War in 1828 and transmitted to the House of Representatives. In other portions of the same report it is said: "Numerous falls and rapids occur, over

which the water rushes with deafening impetuosity." And in a report to the Chief of Engineers, made by N. H. Hutton, Assistant Engineer, in 1876, it is said of certain portions of this stretch of New River that: "the masses of rock cumbering the waterway appear at times almost to have absorbed the river. * * *" In 1912, Maj. F. W. Altstaetter, Corps of Engineers, reported to the Chief of Engineers: "From Hinton to the head of slack water in the Kanawha, a distance of 64 miles, the fall is almost 750 feet. There are many bridges and steep rapids along this portion, including Kanawha Falls, which is about 16 feet high. This whole section is unfavorable for navigation and *the river above it could not be connected with navigation in the Kanawha by the expenditure of any reasonable amount. The navigation between Hinton and Radford must therefore be considered as having no outside river connection.*" (Italics by this court.)

From these reports, as well as from other evidence in the case, I think it clear that that portion of the New river from Hinton (or a few miles below) to Kanawha Falls is not navigable and never has been and is not practicably susceptible of being made navigable. I find also that while, some 60 or 70 years ago, investigations were made and tentative plans suggested for canalizing this portion of the river for purposes of navigation, no steps were ever taken for this purpose and no attempts to render it navigable have ever been made and none are now in contemplation. Due to the plainly non-navigable character of the New river from its mouth up to Hinton, it is evident that there is and can be no connection between navigation on the Kanawha and any alleged or actual navigation on the New river; and that the plaintiff's contention that New river is a navigable water of the United States must rest on evidence that the river possesses that character from Hinton upward.

### Evidence as to Navigability Above Hinton.

In fact, the evidence introduced by plaintiff, and its argument thereon, as to the navigability of New river, relate to that portion of the river extending from some distance above defendant's project to Hinton, in the course of which the river flows from Virginia into West Virginia. It is this stretch of the river which plaintiff seeks to prove has been used and is available for the movement of interstate commerce.

The evidence offered on this issue by both parties is varied and voluminous. It consists of histories, tales of exploration, the reports of commissions, acts of Congress and of state legislatures, official reports made by the Corps of Engineers of the United States Army, maps, profiles, photographs, etc., to which is added the oral testimony of old inhabitants and other persons. No attempt can be made to recite it, even in brief.

I am unable to agree with plaintiff's contention that the early historical descriptions of New river show its availability for navigation in its natural state. These descriptions, beginning with the exploring trip of John Peter Sally in 1742, are of trips of exploration or investigation along the course of New river and, in some cases, of its tributaries. They indicate that the explorers were impressed with the size of the stream and the wild beauty of the scenery along its course, and also that they were impressed with the rapid flow of the stream and its precipitous fall. It is true that large parts of these exploring trips were made by boat along the river, but there is nothing to indicate that the boats used were anything larger than was necessary to hold a few men and their limited and scanty supplies. And, even so, these accounts are replete with recitals of the difficulties encountered by the rapids in the river and of frequent portages to overcome them.

No doubt since persons first settled along this river they have had small rowboats which they have used to move about on the river adjacent to their lands, for purposes of fishing or to cross the river for business or social errands, but this is not navigation in commerce. The first knowledge of anything which could be construed as commercial navigation is the reference to the use of keel boats in various portions of the river. Just when such use began is not known, but we have knowledge of it following the Civil War and prior to 1873. In 1872 Congress provided for a survey or examination to be made of New river from the mouth of the Greenbrier river at Hinton, W. Va., to the lead mines in Wythe county, Va., which latter point is about 30 miles upstream from defendant's project. Pursuant to this such survey was made and a report thereof made to the Chief of Engineers by inferior officers assigned to the work. This report included a general description of the course and character of the stream and a mile to mile description

of the portion surveyed. In this report, reference is made to "the present system of transportation on this portion of the river by keel boats, which carry from two to three tons, and are floated down the river and poled up," and it is stated that an expenditure of $100,000 "would greatly ameliorate the condition of the river for this trade, and would enable the trips to be made with so much more certainty as to induce a considerable increase of trade." Additional surveys and reports were made, resulting finally in the adoption of a plan to create a channel 30 feet wide and 2 feet deep at low water, suited for the "keel boats now in use." It will thus be seen that keel boats were in use on the river prior to any federal improvement and that the improvements were proposed for facilitating the use of these boats.

In 1876 Congress appropriated $15,000 for work on New river and appropriations were continued (although not each year) until 1886, the total appropriations amounting to $112,000. Pursuant to these some work was done in each of the years from 1877 to 1882, inclusive, and a small amount in each of the years 1885 and 1889. The work was confined to making channels through shoal portions of the river, but did not include all of the shoals or falls, and on some of the more precipitous ones no work was done. Neither was the improvement continuous in extent but was divided along three different sections of the river. One of these sections, described by the engineers as the "Lower or Greenbrier Division," extended upstream from Hinton. The next section, referred to as the "Middle, or New River Bridge Division," began about Radford, Va., and extended up to the lead mines in the neighborhood of Austinville, in Wythe county, Va. The third section, known as the "Upper or Lead Mines Division," was from the lead mines toward the head of the river.

On the lower or Greenbrier Division some work was done each year from 1878 to 1882, inclusive, and by the latter year had reached as far as Wiley's Shoals, which is about 26 miles above Hinton. No further work was done on this division above this point and no work was done after 1882. On the middle division, work began at New River Bridge, some 54 or 55 miles above the state line between Virginia and West Virginia, and some work was done in each of the years 1877, 1878, 1880, 1881, and 1882, in the course of which the work reached a point approximately 30 miles up-

stream to the vicinity of Allisonia. Work on this division was also discontinued in 1882. On the upper division, a small amount of work was done in each of the years 1881, 1885, and 1889, the total of which was only 7.9 miles. After the work done in 1889 on this portion of the river, there remained an unexpended balance of several thousand dollars of the appropriation allocated to this division and, upon the recommendation of the local engineer that further expenditure was inexpedient, this balance was not expended. It was later returned to the Treasury upon the repeal of the act providing for the prosecution of the work.

The keel boats, sometimes referred to as bateaux, mentioned in the evidence are described as flat-bottomed boats from 50 to 70 feet long, with a width of 6 to 8 feet, and a draft of about 2 feet. They were moved by poling or towing. They are variously referred to as having a carrying capacity of from 2 or 3 tons up to 10 or 12 tons. In use it is probable that the load varied with the stage and velocity of the stream flow and probably the carrying capacity increased with the improvements made in the channel. The evidence indicates that the use of these boats was local, by which it is meant that they were not used in continuous trips throughout the course of the river but were used on separated stretches of the river where conditions made their use permissible and desirable. The range of their movement was determined by the extent of the pools and the absence of steep shoals in that particular section of the river. For example, from Hinton upward for 23 or 24 miles the river has the least gradient in its course, about 4 feet per mile, with considerable pool water and few precipitous shoals. The same conditions obtain to a more or less extent on the section of the river for 25 or 30 miles above Radford. It was in these separated stretches of the river that practically all of the bateaux navigation took place and only on them that there was any appreciable trade or commerce by boat. It is not meant to say that continuous movement of such boats between Hinton and the vicinity of Radford was impossible or did not occur. There is evidence which indicates that it did occur, but there is a vagueness about the extent to which it occurred and indications that such trips were irregular, were attended with difficulty, and formed no appreciable part of any commercial transportation which took place on the river.

The most definite evidence of the extent of navigation on the river are the reports of the government engineers both before and after beginning improvement of the river in 1877, and these reports repeatedly state that the commercial navigation was local to separated stretches of the stream and that there was no continuous navigation.

It is difficult to determine the extent to which the volume of the keel-boat traffic was affected by the improvements made on the river, but it does appear that the work done by the federal government in no way altered the local character of this navigation, and apparently it was not intended to. As stated, no attempt was made to create a continuous channel throughout the course of the river. The work was confined to improvement in each of several separated sections and was with a view to facilitating the keel-boat traffic in the limited localities where it already existed. The reports of the engineers in charge of the work indicate that their main object was to facilitate the carrying of local products by boat to the railroad outlet for that locality. In the annual report of the Chief of Engineers in 1883, after the work on the lower and middle divisions of the river had terminated, it is said: "It has hardly been practicable to accomplish at any one of the very many points needing improvement all that has been desirable, but the worst places have been worked upon to the greatest extent and efforts thus been made to increase the available navigability of the river over as long stretches as possible, and to increase the facilities for access of the greatest number to the railroads touching the river, and thus connecting with the eastern and western markets districts otherwise much isolated and hitherto dependent on teaming to railroad stations over long and bad roads."

In the same report, it is stated that there were then 17 keel boats in the lower division of the river above Hinton and 8 keel boats in the improved stretch of the middle division above Radford. Most of the boats in the lower division were engaged in transporting logs and lumber from mills along the improved portion of the river to Hinton where the railroad touched the river. Some grain, tobacco, etc., was shipped down to Hinton by boat. References in this report to boat traffic on the lower division make no mention of any traffic originating in Virginia or at any point higher up than 24 miles above Hinton. The traffic was clearly local to that stretch immediately above Hinton and entirely within the State of West Virginia. Similarly the 8 boats in the middle division were in a traffic local to that section. The railroad shipping point there was at New River Bridge, just above Radford, and the principal traffic was boating pig iron down to this point from several small furnaces located 25 or 30 miles upstream.

The above somewhat detailed description of the local nature of transportation on New river has been thought desirable because of the emphasis which the plaintiff places on the pig iron shipments to New River Bridge and upon the volume of lumber, etc., delivered by boat to Hinton. Conceding the accuracy of the testimony in this regard, it is clear, I think, that in each instance the traffic was purely intrastate. It occurred in two widely separated stretches of the river, one over a distance of 25 miles or more entirely in Virginia, and the other over approximately the same distance in West Virginia; and between the two was a stretch of about 60 miles over which there was no appreciable commercial traffic, and little of any sort.

Throughout the annual reports of the Chief of Engineers during the progress of the work on the river there are repeated statements emphasizing the local nature of the boat traffic and pointing out that facilities do not exist for continuous traffic. And, particularly in the later years, it is reported that the latter condition could be obtained only by the adoption of a more general, more radical, and more expensive plan of permanent improvement than that attempted.

In addition to traffic by keel boats evidence was introduced as to steamboats on New river. This attempt at steam navigation was likewise purely local and notably unsuccessful. Several such boats, more or less improvised, all of shallow draft, were built at Hinton and attempted to navigate the pool water immediately above that point. They seem never to have gone further than about 10 miles above Hinton and then only when the river was above normal stage. At least one boat propelled by a gasoline engine was built at Radford for attempted use on the improved stretch of the river above that point, but never got further from its home port than 6 or 8 miles upstream. This boat was about 50 feet long and 7 or 8 feet wide, with a flat bottom and drawing only 4 or 5 inches of water unloaded; when loaded the draft

was about 12 inches. After about a year of sporadic and unprofitable operation around Radford, with various misadventures, the owner decided to take this boat down to Hinton where he had heard that there was a stretch of 8 or 10 miles of still water where conditions for operation were better. Waiting for a rise of 5 or 6 feet in the river, he floated the boat through. The owner's description of the difficulties of that trip strongly deny the availability of the river as an avenue of transportation. No better luck with the venture was had at Hinton and, after a few weeks, the boat was sold for a trivial sum to some one who took it off the river. These attempts represent the history of navigation on New river by boats mechanically propelled. In each instance they were local to short stretches of improved portions of the river and were of short duration. They were merely the manifestations of a spirit of impractical optimism, with perhaps a tinge of curiosity.

Whether the purpose of those who originally inspired and promoted the plan of improving New river with federal funds was to make the river navigable throughout its course is not clear. But it is clear, I think, that the work done had no such purpose but was confined to improving separated stretches of the river to aid in local transportation to railroad points. After the work started, its scope was modified by making channels of lesser depth and lesser width than mentioned in the original plan; and as the work progressed the engineers in charge emphasized in their reports that no attempt was being made to make possible continuous navigation and that such a result could be accomplished only by some plan different and more elaborate than that attempted.

The annual reports of the Chief of Engineers, containing reports made by engineers who were in charge of work on New river or otherwise familiar with it, are of great value in determining the character and extent of navigation on the river and the effect of the improvements made. I quote from some of them.

In the report for 1879, Capt. J. W. Cuyler, engineer on the work, stated that, while the project of improving the river was practicable, it was necessary even for bateaux navigation and rafting "to adopt a more general and radical method to effect a permanent improvement than has heretofore been tried."

In the report of 1883 it is said: "The navigation of the river not being continuous as yet, it is practically a feeder to the railroads which cross it and run along portions of it."

In 1885 it was reported that, from appropriations for the improvements on New river, there was a balance of $3,000 specially designated for use in the upper or Lead Mines division above Foster's Falls "which are not passable"; that it had not been expended because there was no need for it so long as these falls were impassable, but that, when the railroad up Cripple creek had been completed, boats could touch this railroad above Foster's Falls. And the report for 1886 says: "Hitherto the obstruction offered to navigation by Foster's Falls, about 6 miles below the mines, almost rendered it useless to expend the money appropriated for the division under consideration. The construction of the Cripple Creek Railroad, however, abrogates this and puts this division on a par with those of Greenbrier and New River Bridge, for its objective point is a railroad as well as that of the other two. * * *"

The report of the Chief of Engineers for 1887 contains the following: "As Congress has never given such a sum of money as would justify the proper beginning of a connected project for a continuous navigation from the North Carolina border to Hinton, the effort has been to apply such funds as were supplied in ameliorating the condition of the river."

And the view is expressed that, because of the unlikelihood of necessary appropriations, "it is supposed that the same policy *should continue of partial improvement in connection with the railroads.*"

In the same report, Col. Craighill, in charge of the work, says: "For reasons often mentioned in annual and special reports, *no attempt has been made to give a continuous navigation* on New River to Hinton. * * *"

In 1891, the following appears in the course of a report made by Col. Craighill to the Chief of Engineers: "The last directions of Congress have been practically complied with by the expenditure of 75 per cent of the last appropriation. The last work done, however, under those directions was a subject of ridicule by the community near its locality because of its evident uselessness, except to put money into the pockets of a few men and to lead

to the probable control of a few votes. The expenditure of the remaining balance almost entirely in the excavation of rock on the limited part of the river to which it is specifically applicable under the law would not accomplish the smallest useful result and would in my judgment be a shameful waste of public money. It is recommended that it be covered into the Treasury as no longer required for expenditure."

In 1894 citizens of West Virginia, complaining that ore washings deposited in New river at mines in Virginia polluted the water, rendered it unfit for domestic use, destroyed fish and defaced scenery, invoked the aid of the federal government to stop the practice. The matter was the subject of sporadic controversy over many years, during which the War Department repeatedly pointed out that the matter was one of local concern, justifying no action by the federal government. In 1916 the Chief of Engineers addressed a communication to the Secretary of War reviewing this controversy and the action of his predecessors thereon and specifically agreeing with their findings. From this the following excerpts are quoted. Of the first complaints made the then Chief of Engineers said:

"The interests of navigation are not involved in this matter; the controversy is one purely of local concern. * * *

"These are important matters to the people of West Virginia, and the injury inflicted is doubtless of a serious nature; but it is submitted that the General Government can afford no relief and provide no remedy in the premises. The control of Congress is conferred by the commerce clause of the Constitution of the United States, and is to be exercised for the preservation and protection of navigation and the protection of commerce only. The existing laws were enacted, and are to be executed for this purpose only.

"Congress has passed no statute to protect the fish or the scenery of New River, or the purity of its water, and unquestionably such a statute if passed would be invalid."

The controversy was then dormant for some years, but in 1910 it was renewed by a petition which added to the previous grounds of complaint the allegation that the ore washings caused deposits in the Kanawha river, thereby decreasing the navigable depths of the Kanawha and that they otherwise interfered with and obstructed navigation on the Kanawha. After investigation of this renewed complaint, the Chief of Engineers stated in part:

"While this action is desired ostensibly in the interest of navigation on the Kanawha River, it is probable that the real basis of the request is the desire to preserve for the people of the State the use and enjoyment of the waters and scenery of New River. * * *

"There has been no useful navigation on New River at any time, and none is possible under existing natural conditions, nor without the expenditure of vast and prohibitive sums in improvement work. While the discharge of ore washings in New River may produce conditions in the Kanawha injurious and obstructive to navigation, in the various ways alleged by petitioners, it is probable that in most instances the effect is too remote, and too much complicated with other causes to warrant the action desired by the petitioners. * * *"

These quotations are made at length in controversion of the contention that the federal government has, over a long period of years, recognized New river as a navigable stream and asserted its authority over it as such; and to show that throughout this extended controversy the navigability of New river was clearly denied by these officers of long experience and acquaintance with it. Even the complaining citizens made no assertion of the navigability of New river but only that navigation in the admittedly navigable Kanawha was affected.

In 1913 the report of the Chief of Engineers on an examination of New river from Radford to Hinton was transmitted to Congress by the Secretary of War. House Document No. 1410, 62d Congress, 3d Session. After reviewing the character of the stream and the work previously done on it, it is said:

"About $110,000 has been expended on this river in improving the bars by building chutes or sluiceways through them. This afforded possible light-draft navigation and was used to some extent a number of years ago. But little has been done on the river since 1882. There is a very small commerce carried on in the lower part of the reach under consideration by the use of so-called keel boats, which are towed or poled. There

being no connection with the river below, the commerce is local. * * *

"There is very little commerce on this river at present, and as there are no commercial or mining industries of importance, no material increase could be expected even if it were improved. Physical conditions are such that it could not be improved for useful navigation except at prohibitive cost."

On December 29, 1925, the Chief of Engineers made a report to the Federal Power Commission, wherein, after stating his understanding of what constitutes a navigable stream (and his definition is accurate), he says: "Having this rule in mind, I am of the opinion that the data and information disclosed in the Department's records and reports do not support the conclusion that New River affords a channel for useful commerce or that it is navigable in fact. That section of the river between its mouth and the town of Hinton, having a fall of about 735 feet in a distance of less than 60 miles, may be dismissed from discussion. This Department has reported that the whole section is unfavorable for navigation and could not be connected with navigation in the Kanawha by the expenditure of any reasonable amount."

He then recites that surveys have been made of that portion of the river from Hinton upstream to the mouth of Wilson creek, a distance of about 190 miles, partly in West Virginia and partly in Virginia; and, after reciting the reports that the general characteristics of the river are those of a mountain stream, with alternating pools and rapids and with a rocky bed obstructed by boulders, he says:

"The detailed, mile by mile, data given in the reports fully justify these concrete statements, and it seems unquestionable that the river was not navigable in fact in its original natural condition.

"It is my opinion that these natural conditions were not changed by subsequent improvements, to the extent of making the river a highway for commerce."

After reciting these improvements and their local nature, he says: "It is evident that the work executed by the Government during the years 1877-1882 did not materially change the natural nonnavigable conditions of the river. The improvement effected was at most slight and fragmentary, and the small channels worked over are reported to have deteriorated due to the natural action of ice and the current. Continuous

navigation on the river has never been possible, and whatever commerce has existed has been altogether local apparently confined to the 25 mile section in West Virginia, ending at Hinton."

I have chosen to quote at length from the contents of these various official reports because of the weight which I consider they should have on the issue here involved. They were made by responsible officers of the War Department in the course of their official duties and under conditions involving no thought of litigation or controversy. The facts recited are based upon actual knowledge of the river gained by surveying it, observing it, and directing the work upon it. So far as their statements may be said to be expressions of opinion, their source gives value to the opinion, for they are given by men scientifically trained and experienced and one of whose larger duties is in dealing with the navigable waters of the country; men who are acquainted with comparable streams and who know of the requirements for commercial navigation and the engineering problems necessary to establish it where it does not naturally exist.

■ Official findings and corresponding action on the part of the War Department are significant on the question of navigability. United States v. Oregon, 295 U.S. 1, at page 23, 55 S.Ct. 610, 619, 79 L.Ed. 1267.

Finally it may be said that, in response to the declaration of intention filed before it with respect to the project now in question, the Federal Power Commission made a finding on June 1, 1927, that: "Said river in the part thereof involved in said declaration is not 'navigable waters' within the definition thereof in said act" (referring to the Water Power Act).

■ It is clear that the question of navigability is one of fact which must be determined by the court upon all the evidence and that this duty cannot be abdicated; nor is it performed by mere acceptance of the findings or opinions of other persons no matter how competent. But the determination of the issue of navigability permits a wide range of testimony and coming permissibly within this range, I think, are the opinions of persons who by training and experience are competent to speak. So far as the official reports from which quotation has been made express opinions on the navigability of the river, they are accepted merely as opinions to be considered with the other evidence and given such weight as they may be deemed entitled to. With

98

the same thought in mind, the court permitted witnesses to testify at the trial giving their opinions on the issue of navigability.

In past times various dams and bridges have been constructed in or across New river and in some instances persons contemplating such constructions sought permission or approval therefor from Congress or the War Department. I find no instance where this was refused when sought. This appears to have been done merely as a matter of precaution on the part of those sponsoring these projects, and to clothe them with a supposed authority for what it might be worth. As tending to show recognition of federal control over the stream, this evidence loses any value due to the fact that in a like number of instances dams and bridges have been constructed without seeking the permission of federal authority. And where this was done I find no instance where the federal government has sought to interfere with or prevent it. In other words, if permission was sought, it was granted; if permission was not asked, no question was raised.

I find also the following facts, pertinent to this and other phases of the case: That there is at present no commerce or navigation on New river or, if any, it is entirely local and in a trivial and unnoticeable amount; that the federal government has made no improvements on the river since those heretofore discussed and that it does not have in contemplation any improvements affecting the navigable condition of the river; that it does have in contemplation certain projects for flood control, including the erection at a point a few miles above Hinton of what is referred to as the Bluestone Dam, the proposed purpose of which is to impound the waters of New river and control their flow in times of flood and in the aid of navigation upon the Kanawha.

The Law as to Navigability.

The cases which have arisen in this country involving the navigability of water courses are myriad in number. And, apparently, industrious counsel have cited all of them. Except as the decided cases have laid down general principles and have made clear the limitations upon them, it is rarely that one case can be greatly helpful upon the issue of navigability in any other case. Navigability is a question of fact, to be determined by the facts shown in each case.

No power of control over navigable waters is specifically granted to the United States by the Constitution. In cases where it exists, it derives from the power in the federal government "to regulate Commerce with foreign Nations, and among the several States." Const. art. 1, § 8, cl. 3. This power to regulate commerce being limited to that which is foreign or interstate, it follows that the boundary of federal control over navigable waters is the regulation and protection of commerce of a similar nature.

What is probably the most frequently quoted and the most acceptable definition of navigable waters is that laid down in the case of The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999: "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

The rule stated in The Daniel Ball has frequently been repeated and approved down to the present time. United States v. Rio Grande D. & I. Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136; Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L.Ed. 914; Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140; United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465; United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844; United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; and others.

Obviously navigable waterways may lie entirely within the borders of a state and the navigation upon them be entirely intrastate; or they may extend across state lines and be the avenues of commerce between the states. The test of whether the waterway is navigable is the same in each case; but the source of governmental control is vastly different. As clearly indicated in The Daniel Ball, a navigable river is one which meets certain conditions as a highway for commerce; a

*navigable water of the United States* is one which, fulfilling the same conditions, is a highway for commerce *between the states*. It is of the latter only that the federal government has plenary control, and this authority flows from its power to regulate ‐commerce between the states.

■ The rule defining navigability above quoted from The Daniel Ball has never been essentially modified. Later cases have taken occasion to explain or clarify or interpret the language used, but not to alter it. In The Montello, 20 Wall. 430, 442, 22 L.Ed. 391, the rule of The Daniel Ball is quoted, approved, and applied, but it is made clear that the true criterion of navigability is the capability of use by the public for purposes of transportation and commerce, rather than the extent and manner of that use; that capability for use by steam boats and sailing vessels is not required, but only that the stream should be capable of being used for commerce in any mode that commerce may be conducted. At the same time, it is pointed out that navigability is not imparted by the ability to float small boats such as skiffs or canoes, but that it must be generally and commonly useful for purposes of trade.

In Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 801, 44 L.Ed. 914, the definition of the term "navigable waters" given in The Daniel Ball is again quoted, as well as the language used in The Montello, and the court says: "It is a safe inference from these and other cases * * * that the term, 'Navigable waters of the United States,' has reference to commerce of a substantial and permanent character to be conducted thereon."

The court further condemned an instruction given by the trial court that implied that navigability was created by the ability to float any boat, saying that the mere capacity to pass skiffs and small luggers from one state to another did not render a stream a navigable water of the United States and, if it were so held, there would be scarcely a creek or stream in the entire country not included in the term. I do not take this decision to modify the holding in the case of The Montello, but on the contrary to confirm it. Nor do I understand either of the cases to alter the holding in the case of The Daniel Ball, but only to interpret it. There is no need to review the many cases in which the rule has been restated. As late as United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.

Ed. 1267, we find it repeated that the test of navigability is whether the body of water in question, in its natural and ordinary condition, is susceptible for navigation in the customary modes of trade and travel over water and has capacity for general and common usefulness for trade and commerce. It follows that in order to constitute it "navigable waters *of the United States*" the trade and commerce referred to must be of an interstate or foreign character.

■ The plaintiff stresses those cases in which it has been held that it is not necessary that the condition of the stream should be such as to permit the passage of boats at all portions of the stream and that occasional interruption or retardation of navigation by falls, rapids, or other unfavorable conditions does not necessarily render the river nonnavigable. There are cited such cases as The Montello, supra; St. Anthony Falls Water-Power Co. v. St. Paul Water Commissioners, 168 U.S. 349, 18 S.Ct. 157, 42 L.Ed. 497; Economy Light & Power Co. v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847. There can be no question about this general proposition nor about its applicability in those instances where the general test of navigability is met. And all the cited cases hold is that occasional interruptions or difficulties to navigation from rapids, bars, or other conditions do not render a stream nonnavigable where it appears that in fact it is used or is susceptible of use for navigation in spite of such difficulties. For example, in the case of The Montello, involving the Fox River, Mr. Justice Davis, referring to obstructions in the river, says: "This is true, and these obstructions rendered the navigation difficult. * * * But with these difficulties in the way commerce was successfully carried on, for it is in proof that the products of other States and countries were taken up the river in its natural state."

Much also has been said about the susceptibility of developing New river as a navigable waterway through artificial aids to navigation, and it is argued that a stream may still be classed as navigable even though it is found necessary or desirable to alter the natural condition of the river by means of dams, canals, or other structures at points throughout its course. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, is cited. There is no need to discuss the cases in

which such a question has arisen, nor to define the limits within which necessary artificial aids to navigation measure the navigability or nonnavigability of a stream. See Brewer-Elliott Oil & Gas Co. v. United States, 8 Cir., 270 F. 100, at page 103. It is obvious that there are limits. Otherwise every stream with any considerable flow of water would be classed as navigable. The practically unlimited skill and resourcefulness of the engineering profession can, by the use of dredging and the building of dams, locks, canals, etc., turn any stream into an avenue of transportation providing someone is willing to pay for it. Narrow, steep, and rocky mountain streams which are rushing torrents in winter and spring and in times of great rainfall, but which for most of the year are completely dry, could be made navigable by enlarging the stream bed and building dams in sufficient size and number to impound water in pools. But by no stretch of the imagination could such streams, in their natural condition, be termed navigable or reasonably susceptible of navigation.

In 1874 Gen. Barnard, reporting to the Chief of Engineers on the practicability of establishing navigation on the New river from Hinton to its mouth, as part of a route for transportation by water between the Atlantic seaboard and the trans-Alleghany States stated that this could be done only by a "pure lock and dam" system whereby boats would transfer "directly from pool to pool," and that in this stretch of the river alone 60 dams would be required. He further states that, "as an engineer * * * I cannot * * * affirm its practicability, though I have no doubt that, so far as mere construction is concerned, it is so." He reported further that it would be more practicable to build "an independent canal" for this part of the route. I have already quoted a report of the Chief of Engineers in 1910 stating that no useful navigation is possible on New river without the expenditure of "vast and prohibitive sums." The Ashwander Case has no application to such a situation as is depicted here and where all thought of making the stream navigable has been abandoned when investigation showed its impracticability.

▇▇▇ As stated by Mr. Justice Pitney in United States v. Cress, 243 U.S. 316, at page 321, 37 S.Ct. 380, 382, 61 L.Ed. 746, "it has become well established that the test of navigability in fact is to be applied to the stream in its natural condition, not

as artificially raised by dams or similar structures." Even more certainly is this true where the dams or similar structures necessary to create navigability have never been built, are not contemplated, and have been found impracticable.

The plaintiff relies upon the fact that the federal government has made expenditures for the improvement of New river as establishing and recognizing its navigability, and in its brief it is said: "The Government maintains that Congress once having spent money to improve navigation on a river has never abandoned the part so improved except by direct affirmative legislation in which it specifically abandons that part of the river as being non-navigable."

▇▇▇ The fault in this argument is obvious. Navigability is a matter of fact and, if a river is not in fact navigable, it cannot be given that status by legislative declaration, United States v. Cress, 243 U.S. 316, at page 322, 37 S.Ct. 380, 61 L.Ed. 746; much less by the mere appropriation of money to be used to determine whether it can be made navigable. Congress, under importunities from various sources, has made appropriations for expenditures on a great variety of water courses in the country in past years and for various purposes. To say that the expenditure of such funds, ipso facto, invested each and all of these water courses with the status of navigable waters is beyond reason and fact. Indeed, a substantial part of such expenditures have been made in vain attempts to create navigability in streams not navigable and found to be impracticable of being made so. As was said of a like situation in United States v. Brewer-Elliott Oil & Gas Co., D.C., 249 F. 609, at page 618, in relation to Federal appropriations for improvements on the Arkansas river: "Such acts should be assigned weight, in view of the power of legislative inquiry and judgment. But their force is not to declare a river navigable in its natural state * * * and none of these acts purport to do so. A project for river improvement may be to create navigability, or, however prudently formed, may be necessarily experimental, and result in practical abandonment at a given section. * * * While the acts are proper for consideration, they are in any event inconclusive, and leave the fact of actual navigability quite open to proof."

Agreeing that consideration should be given to this fact of federal expenditures upon New river, I think it not illogical to

give consideration also to the fact that after small local expenditures had been made all effort at further improvement was abandoned and that the Chief of Engineers expressed it as his opinion that the improvements made had "not materially changed the natural nonnavigable condition of the river" and advised against further attempts at improvement.

The volume of the evidence introduced before the court has permitted discussion of only the most pertinent features of it and then only in general terms. From a consideration of all of it, the conclusion is reached that New river is not, and never has been, navigable, either in its natural condition or after the improvements made, except in certain short and isolated stretches to each of which the navigation was local and confined within the limits of a single state; and that it has never been used, and has never been susceptible of use, as an avenue of interstate or foreign commerce. It is, therefore, found that defendant's project is not situated upon a navigable water of the United States.

The Effect of Defendant's Project upon Navigation in the Kanawha River.

In 1802 the State of Virginia, by an act of its General Assembly, 2 St. at Large N. S. c. 7, p. 317, reserved to the state ownership of the beds of rivers and creeks in the western part of the state, by the following terms: "Whereas, it hath been represented to this present General Assembly that many persons have located, and lay claim in consequence of such location, to the banks, shores and beds of the rivers and creeks in the western parts of this Commonwealth, which were intended and ought to remain as a common to all the good people thereof: Be it therefore enacted, that no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which shall hereafter be made, shall be valid or effectual in law to pass any estate or interest therein."

The broad language of this act might well inspire a question as to what were the limits of the "western parts" of the state. But there seems no question that New river was considered as being in this indefinite territory and the act was applied to it, with the result that riparian owners along this river hold title only so far as the bank of the stream and ownership of the bed is recognized as being in the state.

The plaintiff has cited this act as a recognition of the navigability of New river.

But the language of the statute discloses no such intent. That portion of the state was then largely unsettled and the state was the proprietary owner of great areas of land of which it was, from time to time, making grants to individuals, That it should see fit to reserve the beds of streams, in order that they should remain under ownership of the commonwealth to be controlled for the public good, was not unusual. But the power to do so was not dependent on the navigability of the stream. The power was that of any owner to grant what he chose and keep what he chose.

It would seem plain that the state, holding ownership and control of this river, for the benefit of its citizens, has the right to make such use of it as it may see fit, subject to any paramount rights of the United States. See United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, at page 703, 19 S.Ct. 770, 43 L.Ed. 1136. One of these paramount rights is that which the United States may have as a riparian owner; the other is the right to protect the navigability of navigable waters of the United States. The first is not involved here, for no property of the United States is affected by defendant's project. It is upon the second named limitation upon the power of the state that the plaintiff relies. It is contended that, irrespective of whether New river is navigable, the erection of defendant's dam should be enjoined for the reason that the erection and operation of the project will impair the navigable capacity of the Kanawha and Ohio rivers.

This likewise involves an issue of fact to be determined by evidence.

"The question always is one of fact, whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact." United States v. Rio Grande, etc., supra, 174 U.S. 690, at page 709, 19 S. Ct. 770, 777, 43 L.Ed. 1136.

On this issue, as on that of navigability, the evidence is voluminous and permits of no detailed description beyond reference to pertinent established facts and to the substance of the evidence in its more important features.

The project for which the defendant has obtained a license from the State of Virginia involves a dam with an over-all height of approximately 130 feet, creating a reservoir with a maximum utilizable storage capacity of 100,000 acre-feet, and

with a power installation which when operated at maximum capacity will utilize about 9,000 cubic feet of water per second.

In the course of its improvements on the Kanawha river the federal government has erected a number of dams across that stream which, to use an engineering term, will completely "canalize" that river; meaning thereby that the Kanawha will consist of a succession of adjacent pools created by these successive dams. The uppermost of these dams on the Kanawha is known as the London Dam, which is about 12 miles below Kanawha Falls; and the London pool extends up to about 4 miles below Kanawha Falls. About 15 miles below the London Dam is the Marmet Dam. About 37 miles below Marmet is the Winfield Dam, which is about 30 miles up from the point where the Kanawha empties into the Ohio. There is also being constructed a dam at Gallipolis, Ohio, on the Ohio river below the mouth of the Kanawha, and the pool of the Gallipolis Dam will extend up to Winfield. The primary purpose of all these dams on the Kanawha is for the improvement of navigation by the creation of navigable pools and they are equipped with locks for the transfer of boats through the dams. However, each of them have installations for the production of electric power in large volume. The power facilities are operated by private interests under lease from the government. London, the uppermost of these dams, is approximately 170 miles below the site of defendant's project.

The alleged interference with navigation on the Kanawha from defendant's project is based upon the operation of that project after completion. Obviously the mere erection of defendant's dam would not affect the navigable capacity of the Kanawha. Water, in the volume supplied by nature would run through New river just the same, with the difference that it would run over the top of defendant's dam at that point instead of in the stream bed. It is in the alleged manner in which that flow would be transmitted to the Kanawha through the operation of defendant's power plant that the plaintiff asserts navigation on the latter stream would be impaired.

The principal contention is that the operation of the plant will create an irregularity of flow in the river, involving periods when there will be little or no water released at plaintiff's dam, followed by periods when water will be turned loose in large volume; that these irregularities will create alternating rises and falls in the pools on the Kanawha and would cause oscillations in the pools, all of which would hamper and obstruct navigation in these pools. There is also the contention that the flow at Radford might be cut off at low-water seasons, depriving the Kanawha of its normal supply of water. And a further contention that defendant's project would interfere with the operation of the flood control and power dam which the federal government proposes to build at Bluestone.

As to the first of these, it is urged that the periodical discharges of large volumes of water in the operation of the defendant's plant will create tides or waves in the river below, which will be transmitted through its course and into the Kanawha creating rises and falls in the pool levels and oscillation of the water in them. A vast amount of evidence was introduced as to the behavior and effect of these tides or so-called "power waves," including charts, graphs, and diagrams of all sorts. It was in large measure theoretical, representing the estimates and opinions of witnesses on assumed methods of operating defendant's power plant. The evidence was sharply contradictory and, in many respects uncertain and confusing. From the plaintiff's standpoint, it was evident that the testimony throughout was based upon the assumption of conditions which offered the greatest degree of possibility of the results which they assertedly feared. In other words, witnesses testified as to what might happen under certain conditions, but without regard to whether such conditions were likely to occur. Apparently witnesses for the plaintiff based their testimony on the assumption that the defendant's plant would be operated at all times as a peak-load carrier and at its maximum hydraulic capacity; that it would operate for 12 or 15 hours with a discharge of 9,000 cubic feet per second, and for the remainder of the twenty-four hours there would be no discharge; and that power waves of great volume would be caused by this operation, with the resultant harmful effect on navigation in the Kanawha, 170 miles below.

The evidence of the defendant was that there was no basis for the assumed conditions pictured by plaintiff's witnesses; that the defendant had no intention of operating the plant in any such method and that the water supply of the stream made it impossible; and that, even were it possible,

it was an economically impracticable and unsound method of operation. I think the evidence fully sustains this latter proposition and, in fact, I do not understand plaintiff's witnesses to claim the method of operation assumed by them to be one which they themselves would approve or adopt. The defendant, however, insists that, even if the project were operated in the manner assumed by plaintiff's witnesses, there would be no such results in the Kanawha as is claimed, and no interference with navigation there. I think also that the evidence supports this contention. In support of it there is offered evidence of tests made in the year 1930 to determine the nature and effect of power waves. At that time engineers of the defendant, in co-operation with engineers of the federal government, conducted tests with waves created at the Byllesby Dam, a plant situated about 48 or 50 miles upstream from the proposed Radford Dam. Waves of varying magnitude were created and the results on the rivers below, including the Kanawha, were observed. Discharges of a maximum of 14,000 feet per second were obtained with an average of probably 8,000 second feet. Apparently the effect of these waves in the Kanawha was negligible. The flattening out of the waves in the passage of the water through New river caused it to enter the Kanawha in such manner as that the rise in that river was so gradual as not to be observable to the eye. The testimony of defendant's engineer who participated in the tests was that they had no effect on the navigable capacity of the Kanawha. The government engineers who participated in these tests were not made available as witnesses by the plaintiff, but it was admitted that, if present, they would testify to the same effect. While these power waves originated some 48 or 50 miles higher upstream than the site of defendant's project, and proper allowance must be made for this fact, nevertheless the results of these tests strongly negative the testimony of plaintiff's witnesses. Further denial of the plaintiff's contentions as to the effect of the so-called power waves was furnished by the testimony of a number of witnesses, engineers of learning and experience, who gave it as their opinion that the operation of defendant's project could have no such effect as asserted by the plaintiff. In this respect, it is the court's opinion that the evidence submitted by defendant far outweighed that of the plaintiff's witnesses. In explanation of this statement, I think it necessary to say that the witnesses who furnished the bulk of plaintiff's testimony on the subject of power waves displayed a bias, an evasiveness, and an unwillingness to admit even obvious facts hostile to their contentions, to such an extent as to deprive their testimony of much value.

I think it deserves comment here that it appears in the evidence that at the London, Marmet, and Winfield Dams, built by the United States government for the improvement of navigation in the Kanawha, the power plants at each of these dams have substantially the same maximum hydraulic capacity as defendant's proposed project, namely, 9,000 cubic feet per second. The discharge from these power plants empties directly into the navigation pools. It is not to be presumed that the government, having built these dams for the improvement of navigation, would at the same time have installed power plants, the operation of which would destroy navigation. And, if the navigable capacity of these pools is not impaired by the discharge of waves directly into them from the operation of these plants, it is difficult to see how it could be harmed by waves emanating from a plant of similar capacity located 170 miles upstream. Nor does plaintiff's evidence take into consideration the dam recently erected and in operation at Hawk's Nest, about 6 miles above the mouth of New river, the reservoir of which would have a marked effect on the dampening of any power waves originating above it.

The contention of possible harm to navigation on the Kanawha from a cutting off of the stream flow by defendant's project at low-water season needs only brief comment. It is a mere suggestion of what possibly could be done with a dam, if the defendant were to operate in complete disregard of its own interest. The suggestion is that defendant might empty its reservoir in periods of low water and shut down for the purpose of refilling it. The evidence is that such a happening is beyond reason and that under no reasonable or accepted method of operation could such a thing happen, and the plaintiff admits that such operation would be contrary to accepted and proper practice. The court cannot base an injunction on such speculative and improbable grounds as this.

Considerable evidence was heard on the alleged effect of defendant's project on the operation of the proposed, but as yet un-

built, Bluestone Dam. This dam is planned to be erected across New river at a point 3 or 4 miles above Hinton, in West Virginia. Plans for the dam have been prepared, its construction has been authorized, and proceedings to acquire the necessary lands along the river have been instituted. There is every probability that the dam will be built and the evidence was on this assumption. The project is allegedly for purposes of flood control and in the interests of navigation on the Kanawha and Ohio rivers and is one of magnitude. The dam is to be approximately 150 feet high. The dead storage will rise about 66 feet; above this will be 49 feet of usable draft storage; and 35 feet above this will be reserved for freshets and flood control. The utilizable storage will be 245,200 acre-feet, about 2½ times the like storage of the defendant's project at Radford, and the storage capacity reserved for floods will be more than 2½ the utilizable storage of the Radford Dam. It is planned to install at the Bluestone Dam a power plant with a maximum hydraulic capacity of 10,000 or 11,000 cubic feet per second. It will thus be seen that the project at Bluestone is much larger in all respects, and particularly in the important matter of storage capacity, than defendant's project. Speaking generally, the purpose of the Bluestone Dam is to impound the waters of New river in a great reservoir from which the flow can be regulated and can also be used in the production of electric power. Under normal conditions, the dam will impound 356,800 acre-feet of water, of which about 112,000 acre-feet will be dead storage and about 245,000 acre-feet will be utilizable storage. This will be used for producing electric power and also to furnish sufficient water for navigation on the Kanawha by releasing it for that purpose, it being proposed that a minimum regulated flow of 2,000 feet per second will be furnished for navigation. The upper 35 feet of the dam, with a storage capacity of approximately 268,000 acre-feet, will normally hold no storage but will be reserved to catch and hold the water arising from freshets and floods and release it more gradually into the stream below.

The plaintiff is not at all clear in its contention as to how the Bluestone project can be adversely affected by defendant's dam at Radford. The evidence on this subject, entirely theoretical, is vague, contradictory, unreasonable, and unconvincing. It is not seen how defendant's project could have the slightest harmful effect on the operation of the Bluestone project. On the other hand, if the Bluestone Dam is to be built as plaintiff insists, and as appears probable, this fact removes all possibility of the alleged disturbance of the Kanawha by power waves from the Radford Dam, even if there were otherwise any danger from this standpoint. It is obvious even to the lay mind that any waves created by discharge from the defendant's plant will be absorbed and lost in the vast reservoir of the Bluestone Dam. The entire discharge of water from defendant's project operating at maximum capacity without interruption for 2 weeks would not fill the reserve storage of the Bluestone Dam, even if no water whatever were passed through the latter during that time. The entire utilizable storage capacity of defendant's dam could be twice emptied into the Bluestone reservoir and still leave 68,000 acre-feet of the latter's reserve storage capacity unfilled. In the face of these facts, the assertion of plaintiff's witnesses that power waves from Radford would pass through Bluestone and on down to the Kanawha cannot be given serious consideration.

I am unable to find anything in the evidence that indicates a probability that the operation of defendant's project will impair the navigable capacity of the Kanawha or any other navigable water. The only suggestion to which serious consideration could be given is the matter of the power waves heretofore discussed. If the Bluestone Dam is built as planned the possibility of harm from this source disappears. And it seems reasonably certain that a dam will be built at Bluestone —if not by the government, then by the defendant itself. But, even if no dam is ever built there, I think the evidence shows that navigation on the Kanawha will not be impaired or hampered in any way by power waves or any other causes due to the operation of defendant's plant at Radford.

The plaintiff has raised further question, and has argued, that the building of defendant's dam will interfere with a general and comprehensive plan of the federal government to regulate the flow of New river for the control of floods and the prevention of soil erosion. These questions need only brief comment. In the first place, it seems clear that the power of the national government is limited to

the protection of such interests as it has the constitutional duty and power to protect. There is no provision of the Constitution giving the United States plenary control over all streams for the sole purpose of controlling floods or preventing erosion of the soil, and none from which such power can be inferred. In the second place, the plaintiff rests on a mere assertion of an interference with its plans. Such evidence as there is leads to a contrary conclusion, namely, that the defendant's dam will be helpful in these respects. New river is a stream of steep and irregular gradient, with a flow of high velocity and varying volume. In any such stream, it may be said, generally speaking, that the erection of any dam which impounds the flow of the stream with means for controlling its release is a helpful factor in overcoming the effects of flood waters. There is no evidence that plaintiff's dam will have other than this usual effect. On the other hand, there is every reason to think it will be helpful.

Since New river, as the court has hereinbefore found, is not itself a navigable water of the United States, it is evident that any valid objection to the erection of defendant's project must rest upon the right of the United States to protect the navigable capacity of the Kanawha (a navigable water of the United States) and, as a means to such protection, to prevent any obstruction in New river which would impair the navigable capacity of the Kanawha. The applicable statute is the Act of March 3, 1899, known as the Rivers and Harbors Act, 30 Stat. 1151, §§ 7, 9, et seq. It now appears in title 33 U.S.C. § 401 et seq., 33 U.S.C.A. § 401 et seq. The act provides, section 10, 33 U.S.C. § 403, 33 U.S.C.A. § 403, that "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited." This act superseded the Rivers and Harbors Act of September 19, 1890, 26 Stat. 454, § 10, which was under discussion in United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, at page 707, 19 S.Ct. 770, 43 L.Ed. 1136.

The language of the two statutes is substantially the same in effect so far as it relates to the act to be prohibited. There is this difference, however, in their provisions as to remedies. The former act provided that proceedings might be instituted by the Attorney General of the United States to prevent by injunction the *creating* or continuing of any such obstruction and to cause the same to be removed, where the obstruction was *threatened* or existed. This was the act before the court in the Rio Grande Case, supra. The present act provides that injunction may be used to enforce the removal of any obstructing structure *erected,* "in any district where [the same] may exist." Section 12, 33 U.S.C.A. § 406. A surface construction of the language of the respective statutes indicates that it was the purpose of Congress, in the present act, not to authorize proceedings by way of injunction against the creation of obstructions or those which were merely threatened, but to authorize such remedy only where the structure had been erected and it had been found that an obstruction existed. This in itself might raise question as to the right of the plaintiff to ask for injunction in this case, where erection of the dam has merely been started. However, the question is not of importance here. Even if it be conceded that the plaintiff under the general principles of equity jurisdiction has a right to seek injunction against a threatened danger, it is apparent that such relief is dependent upon a reasonable showing that the proposed structure will have the harmful effect attributed to it. No such showing has been made here. The most that has been shown is a theoretical possibility of interference with navigation in the Kanawha based upon the supposition that defendant's plant would be operated in a manner which is impractical, not economically sound, and not in accordance with established and approved practice. And it is denied by the much greater weight of evidence that any harm could result even from the theoretical and improbable conditions pictured by the plaintiff. Stated briefly, the plaintiff has shown no probability of harm, but only a theoretical possibility; and even this possibility is denied by the evidence.

In United States v. Rio Grande, etc., supra, it is said, speaking of the prayer for injunctive relief: "Of course, when such proceedings are instituted, it becomes a question of fact whether the act sought to be enjoined is one which fairly and directly tends to obstruct (that is, interfere with or diminish) the navigable capacity of a stream. It does not follow

that the courts would be justified in sustaining any proceeding by the attorney general to restrain any appropriation of the upper waters of a navigable stream. The question always is one of fact, whether such appropriation substantially interferes with the navigable capacity within the limits where navigation is a recognized fact."

■ As intimated in the quotation above, the fact that the plaintiff is the United States government does not alter the legal principles applicable. The federal government, as other plaintiffs, is entitled to relief only when its rights are invaded and this invasion must be established not by mere assertion but by proof. The mere averment that rights of the United States are endangered is not sufficient. If it were, then the national government might, by that mere averment, prevent citizens from making legitimate use of their property and strip the states of all control of any streams within their borders. It is to be remembered that not only does the defendant here have extensive property rights which it seeks to utilize in its business and which are of little or no value to it except as so utilized, but the State of Virginia has important interests involved in its right to develop its natural resources in the interest of its citizens. The Virginia statute, entitled for the "Conservation and Development of Water Courses and Water Resources," Va.Code, c. 139A, § 3581 (1) et seq., provides: "In order to conserve and utilize the otherwise wasted energy from the water powers in this State, it is hereby declared to be the policy of the State to encourage the utilization of the water resources in the State to the greatest practicable extent and to control the waters of the State, as herein defined, and also the construction or reconstruction of a dam in any rivers or streams within the State for the generation of hydro-electric energy for use or sale in public service, all as hereinafter provided." Section 3581(1).

The statute then defines what shall constitute "waters of the State," this including streams which by legislative enactment had theretofore been declared to be navigable, streams used or suitable for use in interstate commerce, and streams "the bed of which is owned by the commonwealth." It is provided that no dam shall be erected in any "water of the state" except upon application to the State

Corporation Commission and after the granting of a license therefor by said commission, after hearing, and finding that the public interest will be promoted thereby or not detrimentally affected.

Pursuant to this statute the defendant made application to the State Corporation Commission for a license, submitting its plans and other pertinent data and, after an extended hearing, the commission, on October 25, 1932, issued a license reciting that "the general public interest will be promoted by the consummation of the proposed development," and in which it set forth the terms and conditions upon which the project should be built and operated.

■ It is conceded that the right of the state to provide for the development of its water powers must be exercised in submission to the paramount interests of the United States to protect its navigable waters. But to deprive the state of its rights in this respect it is necessary that there should exist facts which create a reasonable belief that the interests of the national government will be interfered with. A mere averment of such interference, or a nebulous and remote possibility, is not sufficient. In this case there is no such showing of any existing or potential interference with navigation on the Kanawha as would justify a court in issuing an injunction which would deprive the defendant of the use of its property and tie the hands of the state in the development of its natural resources. And particularly is this true when it is borne in mind that the plaintiff is not foreclosed from compelling removal of the dam if in the future it should at any time prove a detriment to navigation in the Kanawha.

The Federal Water Power Act and
Its Bearing upon the Rights of the
Parties.

What has been said heretofore may be said to be based upon general principles of law which have received the sanction and approval of the courts of this country over a long period of time. However, the facts stated must be examined in the light of the provisions of the act of Congress enacted June 10, 1920, 41 Stat. 1063, as amended, 16 U.S.C.A. §§ 791-823, under the title of the Federal Water Power Act and later, on August 26, 1935, re-enacted with some amendment under the title Federal Power Act, 49 Stat. 863, and now appearing as section 791a et seq. of title 16 U.S.C., 16 U.S.C.A. § 791a et seq., and which plaintiff

invokes as determinative of the rights which it has asserted.

### History of Proceedings Before Power Commission.

Before entering upon any discussion of the applicability of the Federal Power Act, it seems desirable to state the history of the proceedings before the Federal Power Commission in relation to defendant's project. In June, 1925, the New River Development Company, predecessor of defendant, filed with the Federal Power Commission a declaration of intention to construct the project at Radford. This declaration of intention was, in September, 1926, assigned to the defendant, which continued the presentation of the declaration on the same plans. This declaration of intention was filed, so defendant asserts, for the purpose of obtaining from the Commission a declaration that, since New river was not navigable, there is no jurisdiction over the project under the Federal Water Power Act.

It is difficult to ascertain the extent of such investigation as was made by the Power Commission as a basis for a finding as to the effect of defendant's project, as prescribed by section 23 of the Water Power Act, 16 U.S.C.A. §§ 816, 817; but it appears that a request was made of the Chief of Engineers for information upon the stream and upon the effect of the proposed project. Under date of August 20, 1925, General Taylor, Chief of Engineers, made a report to the Commission, giving a general description of New river and of the expenditures made on it in 1876–1882, but his statements as to the effect of defendant's project upon navigation in the Kanawha were quite indefinite. He states in substance that any possible adverse effect was not such as to warrant refusal to allow the proposed construction, if control of it were maintained by the United States, and that proper regulation of the flow would be of benefit to navigation. He made a general recommendation that any license granted should subject the operation of the plant to such regulations as the Secretary of War might prescribe. It is clear from this report that Gen. Taylor assumed that, because federal expenditures had at one time been made on the river, the federal government had jurisdiction over it. He ends by saying that "no sufficient reason is seen why the Federal Power Commission should not exercise jurisdiction over the proposed project."

Because of the lack of definiteness in this report, the Chief of Engineers was requested by the Power Commission, at the instance of counsel for defendant, to render a further report dealing specifically with (1) the navigability of New river and (2) the effect of the proposed project on the navigable capacity of the Kanawha river. Under date of December 29, 1925, such further report was made, reciting that a careful study had been made of all available data pertaining to the river. The physical features of the river throughout its course are described and, after recognizing the error involved in assuming a status of navigability because of the one-time expenditure of federal funds in attempted improvements, the report states the conclusion that the river was not navigable in fact in its original natural condition, that the improvements made did not suffice to make it navigable, and that it is not now a navigable water of the United States.

He reports further that, in his opinion, the proposed project would not and could not interfere with the navigable capacity of the Kanawha. He says that under normal operation of the project the fluctuations in the stream flow "would be so attenuated by the time they reached the Kanawha, 155 miles distant, as to preclude the probability of any adverse effect upon navigation on that river." He states that, even assuming the possibility that the plant at Radford might be shut down indefinitely in a period of low water, the runoff from the drainage area below Radford would supply sufficient water for navigation on the Kanawha. He says that so far as can be predicted from available data "it would not be possible to operate the proposed project so as to adversely affect navigation on the Kanawha River."

"I, therefore, report that in my opinion, New River in its present condition is not a navigable stream and that navigation on the Kanawha will not be adversely affected by the proposed power development."

On March 2, 1926, the Power Commission had a hearing on defendant's declaration of intention. The record of this hearing shows that the only evidence before the Commission was the report of the Chief of Engineers of December 29, 1925. No other evidence was offered or referred to. There were present counsel for the defendant, the Attorney General of Virginia, and counsel for the State Corporation Commission of Virginia, all of whom urged the Commis-

sion to act upon Gen. Taylor's report and leave the defendant free to proceed with its project under the regulation of the State of Virginia. The defendant offered to produce further evidence to support the finding of the Chief of Engineers if the Commission should desire to hear it. No action was taken at this hearing. The records of the Commission do not show that any further hearing was had or any other evidence taken—at least none of which the defendant was informed or that was made a matter of record. Nevertheless, after considerable delay, the Commission made a finding on June 1, 1927, that the New river was *not a navigable* stream within the meaning of the Power Act, but that the interests of interstate and foreign commerce *would be affected* by the construction of the project.

It would be needless and tiresome to recount all the details of what transpired between the defendant and the Power Commission during the several succeeding years. Pertinent facts only need be stated. Following the finding of the Commission of June 1, 1927, the defendant indicated its willingness to accept from the Power Commission a license containing conditions for the protection of navigation on the Kanawha. The Commission, however, indicated that any license issued must be what is referred to as a standard form license, containing numerous conditions, some of which were pertinent to the protection of navigation and many of which were not. Among the conditions of the standard form license were those which provided for supervision by the Power Commission of the defendant's financing and accounting methods in connection with the construction and operation of the plant; provided that the licensee should establish amortization reserves out of any surplus earned; fixed the amount of such reserves and, in effect, authorized the Commission to determine the fair earnings on the plant. Among other conditions were those prohibiting any lease of the property without prior approval of the Commission and giving the United States the right to take over the project at the expiration of the license period. To these conditions and others having no relation to the protection of navigation the defendant objected and asked that they be eliminated as not within the power of the Commission to impose. The defendant requested issuance of what is termed a minor part license, under section 10(i) of the Water Power Act, 16 U.S.C.A. § 803(i), limiting its conditions to those necessary for the protection

of navigation. In the course of the controversy, at the request of defendant, the Attorney General of the United States was requested by the Commission to give an opinion as to the right to issue a minor part license. In response to such request, the Attorney General, on September 22, 1930, rendered an opinion in which, after reviewing the facts, he states:

"Upon the facts stated by the Commission in this case the United States has no power to prevent the construction of the proposed project on the New River unless its operation will tend to impair the navigation on the Kanawha by changing the regular and normal flow of the stream; and the only interest which the United States has to protect, and for which it may be justified in issuing a license, is a very minor part of the complete project, viz., the manner in which the flow of the stream below the dam is affected by the operation of the water power. I am advised by a representative of the Commission that under a license providing merely for proper control of the retention and release of water, this project will tend to improve the navigability of the Kanawha River. Under these circumstances every purpose within the power of Congress may be accomplished by the issuance of a minor part license under paragraph (i) of section 10. * * *.

"This interpretation appears necessary in order to avoid serious questions regarding the constitutionality of the Act. * * *"

Shortly after the rendition of this opinion by the Attorney General, and before any action was taken on it, the personnel of the Power Commission was changed. The records do not show that the new Commission gave any consideration to the opinion of the Attorney General, and on April 3, 1931, it formally denied the application for a minor part license, tendered the defendant a standard form license, and ordered that construction of the project should not be started until such standard form license had been accepted.

The defendant thereafter, and as hereinbefore recited, made application to and received authorization from the State of Virginia to construct the project and indicated its intention to proceed with the construction. Thereafter, at a meeting held on October 12, 1932, the Federal Power Commission, without any further hearing and without any additional evidence, so far as the record shows, reversed the finding of the old Commission that the stream was

not navigable and made a formal finding and declaration that the "New River, from the mouth of Wilson Creek, Virginia, north, is navigable waters within the definition * * * of the Federal Water Power Act." The reason of this action was apparently to strengthen the position of the Commission in any litigation aimed at preventing the construction.

## Effect of the Federal Water Power Act.

The argument of counsel on the Federal Water Power Act has taken a wide range. Much of it, on the part of plaintiff, has been upon the premise that New river is navigable waters of the United States. The defendant, while submitting some argument based on the contingency that such a finding might be made, has steadfastly maintained that the river is not navigable and the mass of its argument is upon that basis. The finding of the court that the river is not navigable waters eliminates the necessity for discussion of much that has been said in the briefs of counsel.

Prior to the enactment of the Federal Water Power Act in 1920, the statutes specifically providing means for the protection of navigation were the Rivers and Harbors Acts. The Act of September 19, 1890, 26 Stat. 454, provided (so far as pertinent here):

"Sec. 7. That it shall not be lawful to build any wharf, pier, * * * dam * * * in any navigable waters of the United States, * * * without *permission of the Secretary of War* * * * in such manner as shall obstruct or impair navigation."

"Sec. 10. That the creation of any obstruction, *not affirmatively authorized by law,* to the navigable capacity of any *waters, in respect of which the United States has jurisdiction,* is hereby prohibited."

It was section 10 of this act which was before the court in United States v. Rio Grande, etc., supra, and which the court construed to prohibit the erection of a dam in a nonnavigable stream where the effect thereof was to so interfere with the flow as to impair the navigable capacity of a navigable river of which the obstructed stream was a tributary.

The Rivers and Harbors Act of March 3, 1899, §§ 7, 9 et seq., 39 Stat. 1151, 33 U.S.C. § 401 et seq., 33 U.S.C.A. § 401 et seq., which is still in effect, provides:

Section 9. "It shall not be lawful to construct * * * any bridge, dam, * * * in any * * * navigable water of the United States until the *consent of Congress* to the building of such structures shall have been obtained." 33 U.S.C.A. § 401.

Section 10. "The creation of any obstruction not affirmatively *authorized by Congress,* to the navigable capacity of any of the *waters of the United States* is hereby prohibited." 33 U.S.C.A. § 403.

Section 7 of the act of 1890 and section 9 of the act of 1899 refer to structures in navigable waters of the United States (physically present therein). Aside from some change of wording and sentence structure, the only essential difference between the two acts is that in the former the consent of the Secretary of War was necessary for the construction, while in the act of 1899 the authorization of Congress is required. The italics in the quotations above have been supplied by the court for the purpose of indicating the amendments.

Section 10 in each act refers to obstructions to the navigable capacity of a navigable water, covering the situation where the obstruction may be physically located outside of the navigable water but be of such nature as to interfere with navigation in the latter. The amendments here made are in changing the words "authorized by law" (in the act of 1890) to "authorized by Congress" (act of 1899) and in amending the words "waters in respect of which the United States has jurisdiction" to read "waters of the United States." We are not concerned with the effect of or reasons for the first of these amendments and, as to the second, it seems clear that there was no attempt at extension of authority, but merely an effort to eliminate an unusual phrase and substitute a synonymous one of more accepted usage.

As the act now stands, it prohibits, in section 9, the erection of any structure *in a navigable water* of the United States, without authority obtained therefor, without reference to the effect of such structure on navigation or otherwise. This is apparently on the theory that the United States has the plenary power over its navigable waters to forbid the erection of any structure therein, without regard to the purpose or effect of such structure.

But, when it comes to dealing with structures located in nonnavigable streams, no such plenary power exists, nor is it as-

sumed by the act. That portion of the act, section 10, relating to the obstruction to navigable capacity, places a ban upon any structure, anywhere, if its effect is to interfere with the navigable capacity of a navigable water. But the condition of the prohibition is that the structure should so interfere. If it does not so interfere, the act sets up no prohibition against it and requires no authority for its erection. The authority of the United States in such cases, i. e., of structures located outside of navigable waters, goes only to insuring that there be no interference with navigation in waters that are navigable and only to the extent necessary to protect such navigation, and may be invoked only upon proof of the fact of such obstruction. This is, I think, the plain meaning of the Rio Grande Case.

I am unable to see that the application of these principles has been altered by the Federal Water Power Act of 1920. That act appears to be not primarily for the protection of navigation but rather to provide conditions under which the water power of navigable streams might be developed for the production of electric power. The title of the act indicates this object and the Commission created for carrying out its purpose is designated the Federal Power Commission. In the Code, the act is published under the title Conservation, not under Navigation and Navigable Waters; nor does it repeal the Rivers and Harbors Act of 1899 which provides for the protection of navigable waters.

The provisions of the act pertinent to this case are the following. After creating the Federal Power Commission and defining the meaning of terms used in the act, it is provided that the Commission, among other powers, is authorized, section 4(d), 16 U.S.C.A. § 797(d), "To issue licenses to citizens of the United States, * * * or to any corporation * *. * for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation, and for the development, transmission, and utilization of power across, along, from or *in any of the navigable waters of the United States,* or upon any part of the public lands and reservations of the United States." (Italics supplied.)

Section 10 of the act, 16 U.S.C.A. § 803, sets forth the conditions upon which licenses shall be issued. These conditions are substantially those which the Commission sought to impose upon the defendant in the so-called standard form license. Among them is the condition, section 10 (c), 16 U.S.C.A. § 803(c), that the licensee shall "so maintain and operate said works as not to impair navigation." There are many other conditions having no relation to navigation.

In subsection (i) of section 10, 16 U.S. C.A. § 803(i), it is provided that "In issuing licenses for a minor part only of a complete project, * * * the commission may in its discretion waive such conditions, provisions, and requirements of this Act [chapter], except the license period of fifty years, as it may deem to be to the public interest to waive under the circumstances."

The most important provisions of the act for the purpose of this case and the ones around which dispute centers are those in the second paragraph of section 23, 16 U.S.C.A. § 817, reading as follows: "Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein [in this chapter] as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States, may in their discretion file declaration of such intention with the commission, whereupon the commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person * * * shall not proceed with such construction until it shall have applied for and shall have received a license under the provisions of this Act [chapter]. If the commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws."

The real question at issue is whether the power of the Commission to require a license is limited to those projects proposed to be constructed in navigable waters or whether it extends to projects located in nonnavigable streams but which will, in the opinion of the Commission, obstruct the navigable capacity of a navigable wa-

ter. Counsel for plaintiff appears to concede that the Power Act undertakes no enlargement of governmental powers over those granted in the Rivers and Harbors Act of 1899, for it is said in plaintiff's brief: "Section 9 of the Rivers and Harbors Act of 1899 [33 U.S.C.A. § 401], referred to above, operated as a regulation of the use of navigable streams for the purpose of creating power, because its necessary effect was to require a person who desired to use a navigable stream for that purpose to obtain the consent of Congress. Until 1920 the only way in which that consent could be obtained was by applying to Congress itself for the passage of a special act of authorization. The Power Act of 1920 provided an alternative method of obtaining congressional consent by applying to the Commission for a license, which the Commission was authorized to issue on the terms and conditions specified in the Act."

It is then argued, apparently, that the same reasoning applies as to section 10 of the act of 1899, 33 U.S.C.A. § 403, i. e., that the necessary effect of that section was to require the consent of Congress to the construction of a dam in a nonnavigable stream, if such structure impaired navigable capacity elsewhere, and that the Power Act of 1920 provided that this consent be obtained in the form of a license from the Power Commission. The implication is that Congress had a right to require its previous authorization before there could be constructed in a nonnavigable stream a dam which would impair navigable capacity elsewhere, and that it has simply delegated this power to the Commission; and has further empowered the Commission to make final determination of whether such dam will obstruct the navigable capacity elsewhere.

■ I do not think such argument is tenable, nor that the case of United States v. Rio Grande, etc., which is cited to sustain it, bears such a construction. The act of 1899 does not require a license for the construction of a project in a nonnavigable stream nor does it make such a project unlawful per se without the authorization of Congress. Such a contention was made in the Rio Grande Case where an injunction was sought against the construction of the project on the ground that, not being previously authorized by Congress, it was unlawful. The court in effect denied such contention. It refused to enjoin the construction simply because it had not been previously authorized, and held that only upon proof that the operation of the project would interfere with navigation elsewhere could it be prohibited. The mere construction or proposed construction of a dam in a nonnavigable stream does not authorize the exercise of federal jurisdiction. That jurisdiction may be exercised only upon proof that through operation of the project, by appropriation of the water or otherwise, there is an actual interference with the navigable capacity of a navigable water. And the federal control over operation of the project goes only to the extent necessary to protect navigable capacity in such navigable waters as are affected. It is to be remembered that the jurisdiction of the United States in all such instances grows only from the power to protect interstate commerce and is limited to the steps necessary for that purpose.

■ A consideration of the language of the Water Power Act, as well as of the circumstances attending its enactment, leads to the conclusion that the construction contended for by the plaintiff cannot be upheld, but that on the contrary Congress did not intend to confer authority to require a license for a project in a nonnavigable stream. The language of the act which is the source of controversy is that portion of section 23, 16 U. S.C.A. § 817, heretofore quoted, which provides that persons who desire to erect a dam in "any stream or part thereof other than those defined herein [in this chapter] as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce * * * among the several States, may in their discretion, file declaration of such intention." And that, if the Commission shall find that the interests of interstate commerce would be affected by the proposed construction, the declarant shall obtain a license "under the provisions of this Act [chapter]."

The defendant urges that section 23 was enacted to provide for the situation where the erection of a dam was contemplated in waters, the navigable status of which was in doubt; and in order that, before proceeding with the construction, the declarant might obtain from the Commission a finding as to whether it held the stream to be a navigable water. It must be said that the language used is somewhat lacking in clarity, but I think the interpretation now urged by the defendant finds support not only in the legislative

history of the act but also in a study of all its terms. This part of section 23, the second paragraph, was added to the original bill as a Senate amendment (being considered. as amendment No. 58). When the bill came from conference, the report of the Managers on the part of the House stated (House Document 910, 66th Congress, 2d Session): "This amendment seeks to prescribe how a stream of doubtful navigability may be determined as within the provisions of the law, and in substance it provides that the Commission shall ascertain whether the interests of interstate commerce are affected; if not permission is granted to construct in accordance with the state laws."

During the course of the Senate debate, Senator King, of Utah, stated (59 Cong. Rec. 1103): "I am afraid that under this bill and under the definitions to which I have called the Senator's attention it will be asserted by those having the administration of the bill that every little stream or rivulet that finds its way directly or indirectly into a larger stream which may become navigable is under the jurisdiction of this commission, so that no man may go upon these little streams and utilize the waters therein flowing for power or other purposes contemplated by this bill, or within the scope of this bill, without obtaining permission from the commission which is created by this bill."

To which Senator Nelson, referring to section 23, answered:

"I think the apprehensions of the Senator from Utah are not warranted. If the whole paragraph be read and considered as an entirety, it will appear that it relates only to navigable streams. It. starts out here with the phrase 'over which Congress has jurisdiction.' The authority of Congress over streams relates to utilizing them for navigation for commercial purposes under the interstate commerce clause of the Constitution. This covers streams either in their natural condition or streams that Congress by appropriation has improved and made navigable. They are all subject to the provisions of this bill.

"I want to call the attention of the Senator in this connection to another provision of the bill in section 23, which relates to construction of dams over portions of streams that are not navigable. The commission in that case is authorized to investigate and if it finds that they are local streams, not navigable, not used for interstate commerce, it can grant authority for the improvement of the streams subject to state laws."

Further in the debate, Senator Jones, referring to section 23, said (59 Cong.Rec. 7729): "May I suggest further in connection with this matter that the Senate placed amendment No. 58 on the bill, under which it provides a way by which a person or company or corporation may get the judgment of the commission with reference to whether a stream is navigable, if they desire to do it. That is for the protection of any person who contemplates putting a dam in a navigable stream. If they exercise the right given to them in this section of the bill, the commission will first make an investigation to see whether or not the stream is navigable and they cannot put their dam in it if the commission says that it is navigable; but if the commission says that it is not navigable, then permission is granted to put the dam in. However, there is nothing which requires them to come to the commission in the first instance and ask their judgment as to whether the stream is navigable or not."

These quotations, and others that might be made, indicate that the purpose of Congress was to delegate to the Power Commission the right to approve the erection of structures in navigable waters, an act which had theretofore, under section 9 of the act of 1899, 33 U.S.C.A. § 401, required congressional approval in each case. As said by Senator Walsh of Montana in the course of the debate: "This is the purpose of the bill. Under the existing law anyone who wants to put any obstruction whatever in a navigable stream must come to Congress and get a special act. The pending bill is a general act, granting the power to give permits through the Commission. That is the purpose of it." 59 Cong.Rec. 7729.

They indicate further that the purpose of section 23 was to give a person contemplating such construction an opportunity to have the judgment of the commission as to whether the stream in which he proposed to erect his project was a navigable water, and thereby determine whether it would require a license. But they do not indicate an intention on the part of Congress to require a license for a structure in a stream not in itself navigable, nor to invest the Commission with any powers

greater than those which Congress itself exercised.

Indeed, the Power Commission itself seems, in the early days of its existence, to have had no doubt about the purpose of the act nor as to the limits of its powers, for in its First Annual Report the Commission states as to its jurisdiction: "The Federal Water Power Act did not propose to bring any new streams within the authority of the Federal Government. It proposed rather to provide a method whereby the status of doubtful streams could be determined, and to set forth in definite form the conditions under which rights upon such streams could be acquired."

And again in 1924, in its Fourth Annual Report, the Commission states: "The Commission has not been given general authority to protect navigation or power interests."

Not only do these expressions in the congressional debate and the expressions of the Commission itself as to the extent of its authority deny the rights to require licenses for structures on nonnavigable streams, but it does not appear that the language of the Power Act justifies such an interpretation. If Congress had intended to take any such far-reaching step, had intended to invest the Commission with the powers which the latter now claims and which are greater than any powers which Congress itself had attempted to exercise, surely it could, and no doubt would, have found language to make its intention clear. As before stated, section 23 was inserted as an amendment to the original bill. Omitting this amendment it is found that the remaining portions of the statute are consistent and unvarying in their reference to navigable waters only. Had it not been for this amendment, there could be no question that Congress was providing a procedure applicable to navigable waters alone. The section of the act, section 4(d), 16 U.S. C.A. § 797(d), which empowers the issuance of licenses, authorizes them only as to projects on navigable waters or upon public lands of the United States. If it had been meant by section 23 to give the Commission a similar power over nonnavigable streams, it seems that section 4(d) would have been correspondingly amended to authorize the issuance of licenses on such nonnavigable streams. But this was not done and the only direct authorization in the act for the issuance of licenses confines them to projects located in navigable waters or on public lands and reservations.

It will be noted that the filing of a declaration of intention under section 23 was discretionary on the part of the person contemplating erecting a dam. This fact argues strongly against the interpretation now claimed by the plaintiff. If it had been intended to give the Commission a power as to nonnavigable streams equal to its authority over navigable waters, why should the filing of a declaration of intention be left discretionary? If plaintiff's contention as to the interpretation of section 23 is correct, we have this situation: That one person might file a declaration of intention and, as is sought in the instant case, be prevented from proceeding with the construction until he had accepted the conditions imposed by the Commission. Another person might proceed with the construction without ever approaching the Commission and could not be halted because the act itself authorized him to use his discretion. Only after he had begun operation and it appeared that his project formed an obstruction to navigable capacity elsewhere could the federal government intervene by resort to the courts and then only to the extent necessary to protect navigation. United States v. Rio Grande, etc., supra. All of which but adds strength to the view that the purpose of section 23 was merely to furnish a means whereby a person contemplating erection of a structure in a stream of doubtful navigability might, for his own protection, obtain the judgment of the Commission as to whether a license was required. It is true that in 1935, since this controversy arose, the act has been amended so as to require declarations of intention to be filed. But this, in my opinion, carries no different implication as to the intention of Congress as to the issuance of licenses on nonnavigable streams. The requirement for a declaration of intention in the present act is necessarily in terrorem merely. If it were ignored, the only power of the federal government would be to go into court and, upon showing that the operation of the project interfered with navigable capacity, compel the operation to be so regulated as not to interfere.

It is not believed that Congress intended to invest the Power Commission with any authority over the erection of power projects in nonnavigable streams different and greater than Congress itself possessed

under existing law. Under the act of 1899, the authorization of Congress is required as a prior condition to the erection of any structure in navigable waters of the United States. The duty of granting such prior authorization Congress delegated to the Power Commission. But no such prior authorization by Congress was required as to projects in nonnavigable streams and Congress had never assumed that it had the power to require it. It is hard to believe that Congress intended to invest the Commission with powers which Congress itself had never undertaken to exercise or assumed to possess.

It is upon this failure to realize the difference between the extent of the congressional power over a navigable water of the United States and its power over a nonnavigable stream that the contention of the plaintiff is at fault. Its position is summed up in the following quotations from its brief:

"The question raised by section 23 is whether the power to require Congressional consent is as absolute and unqualified when exercised with respect to a project which impairs navigable capacity as the power is when it is exercised with respect to a project located in a navigable stream. * * *

"The pertinent decisions of the Federal courts support the argument that the power of Congress to grant or to withhold consent is just as wide in scope when it is exercised with relation to a project which impairs navigable capacity as it is when exercised with relation to a project located in a navigable stream."

It is upon this argument that the plaintiff seeks to justify not only the right of the Commission to require a license as a prior condition to the erection of a dam in a nonnavigable stream but also its right to embody in that license all of the various conditions which it might exact as to a project located in a navigable stream, including those which have no relation whatever to the protection of navigation or navigable capacity. Enough has already been said to make it clear that this court does not find itself in accord with this view of the law. It is not necessary here to discuss or to define the extent of the powers of the United States in its navigable waters. Whether they are unlimited, as plaintiff implies, is not for decision here. But as to nonnavigable waters they are not unlimited. Such authority as the United States has over waters that are not navigable exists only because of its right and duty to protect navigation in waters that *are* navigable and this power may be exercised only when it is shown that a nonnavigable water is so utilized as to interfere with navigation in a navigable water and only to the extent necessary to protect such navigation.

The plaintiff contends, as I understand it, that the Power Commission has the right to determine in advance whether a structure to be erected in a nonnavigable stream will affect navigable capacity elsewhere and that, if it does so determine, then the proposed structure is to be treated in all respects as if it were to be erected in navigable waters and the Commission may impose as a condition of its erection the acceptance of a license containing any and all conditions which might be imposed on projects in navigable waters, even though these conditions may have no connection with or relation to the protection of navigation. And it is further contended that the finding of the Commission on the question of whether the proposed structure will interfere with navigable capacity elsewhere is final and not subject to review by the courts.

 If the Water Power Act were construed as having this effect, there would, in my opinion, be no escape from the conclusion that Congress had exceeded the powers granted it by the Constitution. It is a well-settled principle that any legislative enactment should be construed, where it is reasonably possible to do so, in such manner as to avoid a holding of unconstitutionality or even to raise serious question of constitutionality. Interstate Commerce Commission v. Oregon-Washington, etc., Co., 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588; Crowell v. Benson, 285 U.S. 22, at page 62, 52 S.Ct. 285, 297, 76 L.Ed. 598. It is not meant that, in order to uphold constitutionality, a court is justified in adopting a strained and illogical construction at variance with the plain meaning of the act. If the unconstitutional purpose is clear, the statute must fall. But in this case the court is not facing the problem of seeking a means to uphold the constitutionality of the law. No such search is necessary. It is presumed that the Congress knows the constitutional limits of its powers and intends to keep within them. As has been stated, the antecedent history of this legislation, the declarations made

on the floor of Congress in the course of the proceedings wherein it was enacted, and the reasonable meaning of the language of the act itself, all indicate a purpose within the recognized powers of Congress. That purpose was to vest in the Power Commission the authority to grant permits for and to exercise supervision over the construction and operation of projects in the navigable waters of the United States, a power which Congress itself had previously exercised; and, as incidental thereto, as provided by section 23, to furnish an opportunity to persons contemplating the erection of dams or other structures to have it determined in advance of such construction whether the proposed structure was one over which the Commission would seek to exercise control.

■■■ To give the act the interpretation now claimed for it would require a strained and unnatural construction and one contrary to every proper presumption. It would be to say that the Power Commission, merely by its own declaration (not appealable or reviewable) that the interests of interstate commerce would be affected, could prohibit the erection of any dam or other structure in any stream in the United States, no matter how small or remote, unless and until the owner of the project agreed to build and operate it upon such conditions as the Commission imposed and that these conditions might include supervision over the financial operations of the builder and regulation of his earnings from the project. Under such conditions citizens would be deprived of the use of their property and the power of the states to develop their natural resources as they might deem best, for the welfare of their people would be completely throttled. Individuals, municipalities, and sovereign states could exercise their most valuable property rights only at the will of an agency of the federal government and would be powerless to resort to the courts for protection against any arbitrary and ill-founded finding of such agency. Facing such a situation, it is not unnatural that the Attorney General of Virginia should state in his brief that "The Commonwealth of Virginia denies the right and vigorously protests the attempt of the Plaintiff to prevent, burden or retard the development of her water resources in contravention of the established policy of the State. * * *"

It is my opinion that the powers which the Commission now seek to exercise can-

not be inferred from the provisions of the statute. That they are based upon inferences drawn by the Commission itself is shown by a statement made in the Tenth Annual Report (1930) of the Commission, after this controversy had arisen, and apparently in explanation of its position, where it is said: "The law contains no express authority for the issuance of licenses for such projects on non-navigable streams, but the authority to do so seemed a suitable inference from the provisions of section 23."

I think it pertinent to point out that the record of this controversy before the Commission strongly suggests the completeness and finality of the control which the Water Power Commission might exercise over the streams of the country through the exercise of the arbitrary and uncontrolled powers claimed. After the filing of the declaration of intention, the Commission, pursuant to the statute, undertook an investigation as to the character of New river and the effect of the project and requested a report from the Chief of Engineers in this respect. In his final report, the Chief of Engineers reported that New river was not a navigable stream and further that the project would not interfere with navigation on the Kanawha. In spite of this the Commission, while adopting the report as to navigability, found that the project would interfere with interstate commerce. Possibly it had evidence other than the report of the Chief of Engineers but, if so, the nature of that evidence does not appear. The defendant then agreed to every condition which the Commission proposed for the protection of navigation, but the Commission, ignoring the advice of the Attorney General, still refused permission to proceed unless the defendant would accept other conditions having no relation to navigation. And finally the Commission, with no additional evidence, abruptly reversed the finding of its previous personnel and held that the river was a navigable water of the United States.

■■■ Surely the courts have right to review proceedings of this sort where the constitutional rights of citizens and states in the use and enjoyment of their property are concerned. I wish to make it clear that the plaintiff has not contended that the Commission has the final power to determine whether a stream is navigable or not. But it does contend for the

final power to determine whether a structure in a nonnavigable stream will interfere with navigable capacity elsewhere. I can see no difference in principle as between the two situations. Each involves the determination of a fact upon which constitutional rights depend. In the first instance, that fact is whether the stream is a navigable water of the United States. Neither Congress nor any agency created by it can make a stream a navigable water of the United States by declaring it to be such. It is too well settled to require citation of authority that the determination of facts upon which constitutional rights depend cannot be taken from the courts.

In the second instance, the fact upon which the federal power is dependent is that the structure interferes with the navigable capacity of a navigable water of the United States. Upon the existence of that fact the constitutional power of Congress to intervene depends. And, inasmuch as upon that fact depends the constitutional right of citizens to the use of their property, it follows that they cannot be deprived of the rights to resort to the courts for their protection. As said in Crowell v. Benson, 285 U.S. 22, at page 56–60, 52 S.Ct. 285, 294, 296, 76 L.Ed. 598: "It is the question whether the Congress may substitute for constitutional courts, in which the judicial power of the United States is vested, an administrative agency * * * for the final determination of the existence of the facts upon which the enforcement of the constitutional rights of the citizen depend. * * *

"In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function."

A summary of my conclusions as to the proper interpretation of the Water Power Act and its application may be thus stated:

That it was not intended by the act to authorize the Power Commission to exact licenses as a prior condition to the erection of a power ,project, unless the project is to be located in a navigable water of the United States or upon some part of its public lands or reservations; and that the asserted power of the Commission to require a license as a prior condition to the erection of a project in a nonnavigable stream is not contemplated in nor authorized by the statute.

That if the act were construed (contrary to what, in my opinion, is its manifest purpose) to authorize the Commission to require a license as a prior condition to the erection of a project in a nonnavigable stream, there would be grave question of its constitutionality.

That even if the act could be construed to authorize the Power Commission to exact a license for a project upon a nonnavigable stream, and could be constitutionally upheld as to that power, such power could go no further than to impose upon the operation of the project such conditions as were reasonably necessary to the protection of navigation and that the exaction from the licensee of compliance with conditions having no relation to the protection of navigation would render the act unconstitutional in that respect.

That findings made by the Commission, either as to the navigability of a stream or as to the effect upon interstate commerce of a project located in a nonnavigable stream, are not final, but are in each case the subject of determination de novo by the courts when such findings are challenged.

Other conclusions both as to facts and upon the law have been stated in the course of this opinion and need not be restated here. As has previously been stated, the court has, upon the evidence before it, found it to be a fact that defendant's project is not located upon a navigable water of the United States nor upon any public lands or reservations of the United States. It has further found as a fact that neither the construction nor operation of defendant's project will obstruct the navigable capacity of the Kanawha river or any other navigable water of the United States and that it will not involve any lands or other property of the United States. It follows that, since the facts show that no interest of the United States will be involved or affected, the United States has no authority to interfere with or attempt to regulate or control the construction or operation of the project through the agency of the Power Commission or otherwise; and that the defendant is free to proceed with the construction of its project under authorization of the State of Virginia.

By this it is, of course, not meant to hold that all rights of the United States to complain of this project are forever barred. If at any time in the future the project should be operated in such manner as to interfere with the navigable capacity of the Kanawha or any other navigable water (a contingency which appears most improbable), the United States will not be barred from asserting its right to protect this navigable capacity by compelling a removal of the structure or such modification of its operation as is necessary. But I am convinced that the evidence in this case does not disclose grounds for the issuance of an injunction at this time and the prayer for an injunction will be denied and the bill dismissed.